**[J-69-2015]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 702 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of Sentence |
| | : | entered on August 31, 2014 in the Court |
| | : | of Common Pleas, Westmoreland |
| v. | : | County, Criminal Division at No. CP-65- |
| | : | CR-0000851-2010.  Post Sentence |
| | : | Motions Denied July 16, 2014. |
| MELVIN KNIGHT, | : | |
| | : | |
| Appellant | : | SUBMITTED:  October 7, 2015 |


*Justice Dougherty delivers the Opinion of the Court, except with respect to Part V.  Chief Justice Saylor and Justice Donohue join the opinion in full.  Justices Baer and Todd join the opinion, except with respect to Part V, and file concurring opinions.  Justice Mundy files a dissenting opinion.*


**OPINION**


**JUSTICE DOUGHERTY**                                                      **DECIDED:  November 22, 2016**

This capital direct appeal arises from the torture and murder of Jennifer Daugherty, a 30-year-old intellectually disabled woman.[1]  Over the course of two days, appellant and his five co-conspirators committed escalating acts of humiliation, abuse and torture upon Ms. Daugherty.  The confederates ultimately voted to kill Ms. Daugherty and murdered her in a vicious manner, including stabbing her in the chest, slashing her wrists and choking her.  Appellant ultimately accepted responsibility by pleading guilty to first-degree murder, second-degree murder, conspiracy to commit

---

[1] Our direct appeal jurisdiction is established by 42 Pa.C.S. §9711(h)(1).

murder, kidnapping, and conspiracy to commit kidnapping.[2]   Following a penalty hearing, the jury returned a verdict of death.

## I. Background

After careful review of appellant's fourteen issues, we are constrained to vacate the judgment of sentence and award a new penalty hearing on appellant's thirteenth claim.  We also address the sufficiency of the evidence to support first-degree murder and a number of other claims of concern to the Court, including claims which may recur at the new penalty hearing.

The penalty phase included extensive evidence concerning the kidnapping, torture and murder of the victim and the disposal of her body, largely derived from the testimony of codefendant Amber Meidinger, who pleaded guilty to third-degree murder and cooperated with the Commonwealth.  The evidence revealed that, on February 8, 2010, appellant and his pregnant girlfriend Meidinger were at the Greensburg, Pennsylvania bus station when appellant noticed codefendant Ricky Smyrnes.  Smyrnes was there with the victim and the other codefendants, Angela Marinucci, Robert Masters, and Peggy Miller.  The victim, who had the intellectual capacity of a fourteen-year-old, had taken a bus to Greensburg to attend a doctor's appointment the next day and intended to stay at Smyrnes's apartment.  Meidinger recognized the victim from a facility they both attended that provided services to clients with mental disorders and disabilities.  In conversation with Meidinger, the victim said she was going to marry Smyrnes; Meidinger noticed tension between the victim and Marinucci after Marinucci overheard the remark.

---

[2] 18 Pa.C.S. §§2502(a), 2502(b), 903(a)(1), 2901(a)(3) and 903(a)(1), respectively.

Marinucci accompanied appellant and Meidinger to their hotel and confided she was in a relationship with a married man; Meidinger eventually learned Smyrnes was the man. At the hotel, Meidinger overheard Marinucci tell Smyrnes during a phone conversation, "[Y]ou better not be with that bitch[,]" referring to the victim. N.T. Penalty Phase, 8/22/12, at 535. Meidinger and appellant later joined Smyrnes at his apartment, where Masters and Miller were also present. Smyrnes invited appellant and Meidinger to stay the night. The victim arrived and later attempted to be intimate with Smyrnes, who rebuffed her and became angry with her.

The next day, the victim decided not to go to her doctor to get her medication, which angered Smyrnes and appellant. While the victim showered, Smyrnes phoned Marinucci and told her about the victim's sexual advances the prior evening. Marinucci responded, "nobody is having sex with my man." *Id.* at 552. Going forward, the conspirators engaged in a continuing course of abusing the victim.

The conspirators first bullied the victim by taking things from her purse and pouring mouthwash on her purse and clothing. They then hit the victim on the head repeatedly with empty soda bottles, until appellant grabbed her, knocked her into a wall, and began choking her until the victim fell to the floor crying.

Later, Marinucci arrived, still distressed about the victim's advances toward Smyrnes. Marinucci and Meidinger accosted the victim in the bathroom. Marinucci pushed her into a metal towel rack three times and struck her in the chest and head. After the victim denied any interest in Smyrnes, Meidinger shoved her into the towel rack three times, causing her to strike her head. Appellant then dragged the victim into the living room, where he and Smyrnes dumped spices and oatmeal on her head after Marinucci poured water on her. Smyrnes then directed the victim to shower.

After the victim showered, appellant brought her out of the bathroom, forced her to remove her clothes, and threw them out of the window. With Smyrnes's help, appellant cut off the victim's hair, made her clean it, then took her into the living room and stuffed a sock into her mouth. Thereafter, appellant raped her.[3]

After Marinucci decided to spend the night, appellant, Meidinger, and Smyrnes accompanied her to her house to retrieve her prescription medication.[4] Smyrnes instructed Masters and Miller to remain with the victim and not let her leave. As the foursome was returning to the apartment, Miller called and related that the victim was trying to depart. Upon arrival, the group beat the victim, gave her some of Marinucci's medication, and left her in the living room while they went to bed.

The following morning, a dispute over soda led Marinucci to push the victim to the floor and hit her. In defense, the victim kneed Marinucci in the stomach, causing Marinucci to report to Smyrnes that the victim had killed her baby (in fact, Marinucci was not pregnant). Smyrnes confronted the victim, demanding, "[I]f you want to kill my kid, why should I let you live[?]" *Id.* at 596. Marinucci insisted that Smyrnes choose between her and the victim, leading Smyrnes to call a "family meeting" and ask the others' opinions regarding what kind of mother the victim would be. At this point, the victim appeared to be "out of it," having been beaten, raped, and drugged. *Id.* at 600.

Following a second "family meeting," appellant put the victim in the bathroom, and Meidinger hit her in the head with a towel rack to force her to drink Marinucci's urine from a cup. The victim gagged into the toilet. Meidinger repeated this action with a

---

[3] Appellant was not charged with, nor did he plead guilty to, rape. Evidence of the rape was introduced at the penalty phase in support of the aggravating circumstance that the killing was committed during the course of a felony. *See* 42 Pa.C.S. §9711(d)(6).

[4] Marinucci was prescribed Seroquel, an antipsychotic medicine. *See generally* N.T. Penalty Phase, 8/28/12 at 669, 706-07.

second concoction containing feces and urine, striking the victim in the head with the towel rack until she obeyed, again gagging. Meidinger and appellant made a third foul mixture containing powdered detergent, water, and some of Meidinger's prescription medication,[5] which Meidinger forced upon the victim, again hitting her in the head with the towel rack until she consumed it and vomited.

The torture continued unabated. Appellant took the victim into the living room, where he and Smyrnes bound her feet with Christmas lights. When the lights did not function, Smyrnes, appellant, and Meidinger removed the bulbs and tied the victim's ankles and wrists with the empty strings, adding Christmas garland around her ankles. During this time, Miller's nail polish was applied to the victim's face. Smyrnes called a third "family meeting" and inquired whether they should kill the victim. After the "family" voted to kill, Smyrnes forced the victim to write a suicide note and told her the conspirators were going to make her death look like a suicide to avoid being held responsible.

Appellant took a knife from Smyrnes, who told him, "You know what to do." *Id.* at 636. Appellant and Meidinger took the victim to the bathroom, forced her to her knees, turned off the light, and shut the door. Appellant asked Meidinger if she was ready, and she replied she was. After appellant put something in the victim's mouth to keep her silent, he asked her if she was ready to die, then stabbed her in the chest multiple times, and stabbed and sliced her neck. As the victim lay gasping, appellant exited the bathroom and announced she was not dead yet. Marinucci said to kill her, that she

---

[5] Meidinger was prescribed Geodon, an antipsychotic medication used to treat depression, anxiety, or psychotic symptoms, or as a mood stabilizer. *See generally* N.T. Penalty Phase, 8/28/12 at 1404; N.T. Penalty Phase, 8/29/12 at 1470-71.

wanted her "out of here." *Id.* at 617. Smyrnes took the knife and cut the victim's wrists, after which he and appellant choked the victim with the Christmas lights.

After the victim perished, Smyrnes called another "family meeting" to decide what to do with her body. Ultimately, Smyrnes and appellant left the apartment with the victim's body in a plastic bag inside a garbage can. Upon returning, they told the others they had left the can under a truck. The conspirators then went to bed.

The victim's body was discovered later that morning by a man who found the garbage can underneath his work truck in a middle school parking lot. He contacted police, who launched an investigation, and the victim's body was identified. Dr. Cyril Wecht, the forensic pathologist who performed an autopsy on the body, received the body while it was still in the garbage can — placed head first, partially covered with plastic bags, with Christmas lights wrapped around the neck and wrists, and a decorative material binding the ankles. The body had suffered multiple incised wounds, abrasions, and contusions, and several prescription drugs were found in the victim's system. Dr. Wecht concluded the cause of death was a combination of all of the injuries, but was primarily due to stab wounds of the chest, which penetrated the left lung and went into the heart, producing a substantial hemorrhage. Dr. Wecht opined these injuries were inflicted shortly before death, with the intent to cause pain and suffering: the victim would have remained conscious after the initial infliction of the wounds, bled for a couple of minutes, lost consciousness, and finally died within four to six minutes.

The Commonwealth pursued two aggravating circumstances: the killing was committed while in the perpetration of a felony, 42 Pa.C.S. §9711(d)(6); and the killing was committed by means of torture, 42 Pa.C.S. §9711(d)(8). Appellant pursued four mitigating circumstances: no significant history of prior criminal convictions, 42 Pa.C.S.

§9711(e)(1); his age at the time of the crime, 42 Pa.C.S. §9711(e)(4); extreme duress, 42 Pa.C.S. §9711(e)(5); and the "catch-all" mitigator. 42 Pa.C.S. §9711(e)(8). The jury found both aggravating circumstances and the catch-all mitigating circumstance (which the jury foreman expressed as "mental health issues") had been established and unanimously concluded the aggravators outweighed the mitigator. The jury thus sentenced appellant to death. *See* 42 Pa.C.S. §9711(c)(1)(iv).[6]

## II. Sufficiency of Evidence for First-Degree Murder

In capital direct appeals, this Court conducts an independent review of the sufficiency of the evidence supporting the first-degree murder conviction, even if the defendant does not challenge evidentiary sufficiency and even if, as here, the defendant pleaded guilty. *See Commonwealth v. Zettlemoyer*, 454 A.2d 937, 942 n.3 (Pa. 1982) (to fulfill review obligation imposed by 42 Pa.C.S. § 9711(h), Court shall review sufficiency of evidence supporting first-degree murder, even where appellant does not contest sufficiency), *abrogated on other grounds by Commownealth v. Freeman*, 827 A.2d 385 (Pa. 2003); *see also Commonwealth v. Bryant*, 67 A.3d 716, 721 (Pa. 2013) (Court's duty to conduct sufficiency review in capital cases not abrogated where

---

[6] The Commonwealth provided notice of its intention to seek the death penalty for appellant, Meidinger, and Smyrnes. As noted, Meidinger cooperated with the Commonwealth; she pleaded guilty to third-degree murder, kidnapping, and conspiracy, and was sentenced to 40 to 80 years' imprisonment. Smyrnes was found guilty of first-degree murder and sentenced to death. Marinucci was found guilty of first-degree murder and sentenced to life imprisonment without parole. (Marinucci was seventeen years old at the time of the murder and thus was ineligible for the death penalty. *See Roper v. Simmons*, 543 U.S. 551 (2005) (death penalty unconstitutional as applied to juveniles)). Masters and Miller pleaded guilty to third-degree murder and conspiracy to commit kidnapping and murder. Masters was sentenced to 30 to 70 years' imprisonment, and Miller was sentenced to 35 to 74 years' imprisonment.

appellant pleaded guilty to first-degree murder); *Commonwealth v. Fears*, 836 A.2d 52, 58 (Pa. 2003) (applying *Zettlemoyer*'s mandate where appellant pleaded guilty to first-degree murder and was sentenced to death).

Given the nature of the injuries inflicted upon vital parts of the victim's body, appellant's active role in inflicting many of those injuries, and his plea admitting to the crime, the evidence was ample to support his guilt of first-degree murder. *See generally Commonwealth v. Maisonet*, 31 A.3d 689, 693 (Pa. 2011) ("To obtain a first-degree murder conviction, the Commonwealth generally must demonstrate that: a human being was unlawfully killed; the defendant was the killer; and the defendant acted with malice and a specific intent to kill. *See* 18 Pa.C.S. §§ 2501, 2502(a)[.]"). Although appellant did not act alone, malice and specific intent to kill were amply demonstrated by his stabbing the victim in the chest multiple times with a knife, and then slashing her neck. Indeed, the facts are such that it is not difficult to see the basis for appellant's decision to accept responsibility and plead guilty. Accordingly, we will not disturb the murder conviction.

### III. Dispositive Claim (Issue XIII in Brief: Jury's Failure to Find Lack of Significant History of Prior Criminal Convictions Mitigating Circumstance)

We turn next to the penalty phase issue we deem dispositive. Subsection (e) of the death penalty statute lists eight mitigating circumstances, the first of which addresses the absence of a significant history of prior convictions:

**(e) Mitigating circumstances.--**Mitigating circumstances shall include the following:

(1) The defendant has no significant history of prior criminal convictions.

42 Pa.C.S. §9711(e)(1). It is undisputed appellant had no prior felony or misdemeanor convictions. At a sidebar conference, appellant's counsel proposed a stipulation that would state appellant had "no prior criminal history of misdemeanor or felony convictions." The prosecutor responded he had no objection to introduction of appellant's criminal history (*i.e.*, his "rap sheet"), but stated: "I'm not going to stipulate to a mitigating circumstance." Appellant's counsel explained he did not want to introduce the rap sheet because it reflected a prior misdemeanor charge for loitering and prowling which had been withdrawn. N.T. Penalty Phase, 8/29/12, at 1624. In his case in mitigation, counsel instead presented evidence of appellant's lack of convictions through the testimony of Detective Vernail, *id.* at 1678, and the Commonwealth presented no contrary evidence.[7]

In closing, the prosecutor essentially admitted the fact to which he had refused a stipulation, but then argued appellant's lack of criminal convictions was of little significance given other circumstances of the crime:

> Lastly, I expect [appellant] will argue, rightfully so, that he has no significant history of criminal convictions. And that is true. You remember

---

[7] The exchange with Detective Vernail was brief:

[Defense Counsel]: [D]uring the course of this case, did you run the criminal record history for Melvin Knight?

[Detective]: Yes.

[Defense Counsel]: Does Melvin Knight have any prior convictions for misdemeanors or felonies?

[Detective]: No.

N.T. Penalty Phase, 8/29/12, at 1678. Counsel apparently framed the questioning in terms of misdemeanors and felonies because appellant had received citations for summary matters. *Id.* at 1776-77. There is no argument made, here or below, the summary matters qualify as convictions for purposes of the (e)(1) mitigator.

that [counsel asked] Detective Vernail yesterday whether he had obtained a criminal history of [appellant] and Detective Vernail did and it did not show any convictions. So, certainly this is a mitigating circumstance that is permitted to be offered in a death penalty trial. And, again, you must consider that. But I ask you to balance that against the horrific events of this particular crime. …

*Id.* at 1768. Notwithstanding the undisputed evidence and the prosecutor's concession, the jury was not directed to find the (e)(1) mitigating circumstance and it ultimately did not find it proven.

Appellant now contends the jury was required to conclude the (e)(1) mitigator was established and its failure to do so was "arbitrary and capricious." Appellant's Brief at 37-39. Appellant cites the mandatory statutory language and relies heavily upon *Commonwealth v. Rizzuto*, 777 A.2d 1069 (Pa. 2001), *abrogated on other grounds by Freeman*, *supra*, where this Court ordered a new penalty hearing because the jury did not find the (e)(1) mitigator despite the parties' stipulation to its existence. *See id.* at 1089 (discussed below). Appellant also contrasts his situation to one where a defendant in fact has a history of prior convictions; he concedes the jury may then determine whether the conviction(s) comprise a **significant** history. Appellant further contrasts his situation to cases where the mitigators pursued included a subjective element necessarily for the jury. *See Commonwealth v. Diamond*, 83 A.3d 119, 132-35 (Pa. 2013) (discussing weight-of-the-evidence challenges to jury's failure to find mitigating circumstances (e)(3) (substantially impaired capacity to appreciate criminality of conduct or to conform conduct to requirements of law) and (e)(8) (catch-all mitigator, premised upon life history)).

The Commonwealth counters by citing *Diamond* for the general propositions that (1) a capital jury is not required to find any mitigating circumstances, even if the Commonwealth fails to rebut the existence of a factor, *see id.* at 134, *quoting Commonwealth v. Flor*, 998 A.2d 606, 626 (Pa. 2010); and (2) it is exclusively the jury's

function to decide whether aggravating and mitigating circumstances exist and then determine whether aggravators outweigh mitigators. *See id.* at 135, *quoting Commonwealth v. Reyes*, 963 A.2d 436, 441-42 (Pa. 2009). The Commonwealth contends *Rizzuto* is inapposite because *Rizzuto* involved a stipulation. The Commonwealth notes, while it did not rebut appellant's lack of criminal convictions, it argued to the jury "that the lack of criminal history was insignificant" given other circumstances, and "that mitigating factor should be given no weight by the jury and not consider it a mitigating factor." Appellee's Brief at 37-38.

In its opinion, the trial court viewed this claim as challenging the weight of the mitigation evidence and the jury's weighing of mitigating factors against the aggravating circumstances. The court further noted: "The law is clear that the task of determining the existence of mitigating factors is for the jury alone." Tr. Ct. slip op. at 22, *quoting Commonwealth v. Walter*, 966 A.2d 560, 568 (Pa. 2009), *citing Commonwealth v. Treiber*, 874 A.2d 26, 30-31 (Pa. 2005). In the court's view, since it was undisputed the jury was properly instructed, the jury had the sole power to determine if a mitigating circumstance existed. The court neither cited nor discussed the *Rizzuto* case.

In our view, this issue is controlled by *Rizzuto* and the plain language of the statute; consequently, appellant is entitled to a new penalty hearing. The parties in *Rizzuto* stipulated to the absence of a previous criminal record; the judge accepted the stipulation and instructed the jury to "take [the stipulation] as a fact;" but the jury failed to find either of the two mitigators Rizzuto pursued, (the (e)(1) mitigator or the (e)(8) catch-all mitigator), while it found the single aggravator and returned a sentence of death. On appeal, Rizzuto claimed the jury was required to find the stipulated (e)(1) mitigator, which it was then required to weigh against the aggravator. In sustaining Rizzuto's

argument, the unanimous Court adopted the dissenting view in the 4-3 decision in *Commonwealth v. Copenhefer*, 587 A.2d 1353 (Pa. 1991).

The facts in *Copenhefer* were materially identical to those in *Rizzuto*: the parties stipulated Copenhefer had no prior record, the jury failed to find that mitigating circumstance or any other mitigator, and it returned a sentence of death. On appeal, Copenhefer claimed the trial court erred in declining to charge the jury that his lack of a prior criminal record established the (e)(1) mitigator as a matter of law. The *Copenhefer* majority held no error occurred because it was apparent, from the jury charge and the verdict slip, the jury had considered Copenhefer's lack of a prior record in its deliberations, despite not finding the mitigator. *Id.* at 1358-60. In a concurring and dissenting opinion, Justice Cappy (later Chief Justice) would have granted relief on the issue, stressing the mandatory language of (e)(1) and the stipulation. Justice Cappy reasoned the (e)(1) mitigator has to be treated as established if an "objective circumstance is present." *Id.* at 1366 (Cappy, J., concurring and dissenting, joined by Nix, C.J., and Zappala, J.). *See id.* ("Where the absence of a prior record is not in dispute, as in this case, the sentencing jury has no discretion whether or not to consider it as the General Assembly has made it clear that this circumstance is a *mandatory* subject for jury consideration[.]") (emphasis original). The dissent thus would have held the jury was required to find the (e)(1) mitigator. *Id.*

The unanimous *Rizzuto* opinion was authored by Justice Cappy and the Court expressly adopted his *Copenhefer* dissent's reasoning. *Rizzuto* thus stressed that:

> Under the sentencing scheme in death penalty cases, the jury is required to find the existence of any mitigating circumstances that have been proven by a preponderance of the evidence. … Consequently, where the absence of a prior record is not in dispute, as in this case, the sentencing jury has no discretion whether or not to find the existence of this fact as a mitigating factor.

*Rizzuto*, 777 A.2d at 1089. The Court further tied its analysis to the purpose of the statutory capital sentencing scheme, including this Court's statutory review of death sentences:

> If we would grant the jury discretion to ignore stipulations of fact, we would be granting the right to arrive at a sentencing verdict in an arbitrary and capricious fashion. Such a conclusion would undercut the very purpose of the death penalty sentencing scheme as developed by our General Assembly. A sentence of death cannot be "the product of passion, prejudice or any other arbitrary factor." 42 Pa.C.S. §9711(h)(3)(i).

*Id.* The Court acknowledged the aggravator found by the jury might have outweighed the stipulated mitigator, but added it was "beyond the purview of this court to render such a finding." *Id.* Because the sentence did not follow the statutory process, the Court held the trial court "erred in accepting the verdict as to the sentence of death" and remanded for a new sentencing hearing. *Id.*

It is true *Rizzuto* and *Copenhefer* involved stipulations to the absence of a prior criminal history, but that distinction is inconsequential given the command of the statute and the reasoning in *Rizzuto*. *Rizzuto* addressed more broadly the powering statutory circumstance: situations "where the absence of a prior record is not in dispute." That particular fact — which the parties agreed was present here — is subject to objective measurement. It matters little whether an indisputable objective fact is presented by stipulation or by some other agreement or concession (such as the prosecutor's closing here). Obviously, in light of the explicit reasoning in *Rizzuto*, when it is undisputed (or indisputable) the mitigator objectively exists, it would be wise for the prosecutor to stipulate and for the jury to be directed to find the mitigator, so the death penalty statute is followed. Failure to take such measures, for whatever reason, results in the situation here: the court below, like the court in *Rizzuto*, accepted a verdict of death that included an arbitrary failure to honor a statutory mandate. *See also Commonwealth v.*

*Boczkowski*, 846 A.2d 75, 102 (Pa. 2004) ("An action or factor is arbitrary if it is not cabined by law or principle.") (citations omitted).

We recognize the language in our cases regarding the jury's general role respecting the finding of aggravators and mitigators but, as the rationale of *Rizzuto* plainly reflects, this particular mitigating circumstance differs from more subjective (and more easily disputable) mitigators such as, for example, those implicating "extreme mental or emotional disturbance," 42 Pa.C.S. §9711(e)(2), mental capacity, 42 Pa.C.S. §9711(e)(3), or the catch-all, 42 Pa.C.S. §9711(e)(8). Also, there are instances where the (e)(1) mitigator may be invoked and the question of its existence is properly reposed in the jury, *e.g.*, if the defendant, in fact, has a prior criminal record and the question is its relative "significance." When the absence of a record is undisputed, the jury has no discretion but to find the objective circumstance, and specifically include it in any weighing of aggravators and mitigators.[8] The parties and the trial court have a corresponding responsibility to ensure the statutory construct is honored and the process is not compromised by an arbitrary factor.[9] A required mitigating circumstance

---

[8] We recognize this conclusion is unusual in that a jury generally is not obliged to believe the testimony of a witness (even uncontradicted testimony), *see Commonwealth v. Wilkes*, 199 A.2d 411, 412-13 (Pa. 1964), and an attorney's argument is not evidence. *Commonwealth v. Carson*, 913 A.2d 220, 269 (Pa. 2006). *See also* Dissenting Opinion, at 3-6. However, this case presents special circumstances, including uncontradicted evidence respecting the absence of felony or misdemeanor convictions, the explicit concession of an officer of the court, and the absence of any evidence at trial of summary convictions, much less any suggestion here or below that summary offenses trigger a jury inquiry into the significance of those convictions for purposes of the statutory mitigator. *See supra* at footnote 7. These circumstances taken together are synonymous with a stipulation that satisfies us the jury was obliged to find the mitigator and should have been so instructed; a conclusion otherwise would trigger the statutory proscription against a death sentence premised upon an arbitrary factor. *See* discussion *infra*.

[9] We do not dispute the Commonwealth's point that the prosecution may urge jurors — as the trial prosecutor did here — they should attach little **weight** to the absence of a prior record given other circumstances; however, that scenario implicates a weighing (continued…)

can no more be arbitrarily ignored than an aggravating circumstance can be arbitrarily created through unlawful action. *See Boczkowski*, 846 A.2d at 102 ("By taking an unlawful action which led to the creation of an aggravating circumstance that did not [otherwise] exist …, the Commonwealth introduced an element of arbitrariness;" Court therefore vacates death sentence and remands for imposition of life sentence).

We also realize this case differs from *Rizzuto* and *Copenhefer* for a reason not cited by the Commonwealth: the jury here found another mitigating circumstance and engaged in a weighing of the aggravators and that mitigator. This difference does not alter the legal analysis, however, given that the jury's weighing deliberation did not include a second mitigator it was required to find, which introduced an arbitrary factor, and given that, as *Rizzuto* noted, we are not positioned to conduct the appropriate jury weighing in the first instance. Along the same lines, the Commonwealth has not offered an alternative argument sounding in harmless error, nor could such an argument succeed in these circumstances. *See*, *e.g., Commonwealth v. Moore*, 937 A.2d 1062, 1073 (Pa. 2007) (on appeal, Commonwealth has burden of proving beyond reasonable doubt error could not have contributed to verdict).

Accordingly, we vacate the judgment of sentence and remand for a new penalty hearing.

## IV. Death Eligibility Claim (Issue XIV in Brief: Constitutionality of Death Sentence Where a Codefendant Received Lesser Penalty Pursuant to Negotiated Plea)

---

(…continued)
function that simply does not occur if the jury is improperly permitted to decline to find a mitigating circumstance that, under the circumstances, it is required to find by statute.

Appellant's last issue neither alleges error in the penalty trial nor seeks a new hearing, but claims instead a death sentence is unconstitutional in his circumstances, given the Commonwealth's plea arrangement with codefendant Meidinger. As posed, the claim appears to assume death penalty ineligibility which, if meritorious, would afford appellant greater relief than a new hearing. Thus, we will address the issue.

Citing evidence at the penalty hearing,[10] appellant argues his death sentence resulted from arbitrary factors, was a product of unfettered prosecutorial discretion, and violated equal protection. Appellant stresses that he confessed to the crime when arrested, he pleaded guilty, and he offered to cooperate and testify against his codefendants, but the Commonwealth refused his attempts to negotiate a life sentence. In contrast, Meidinger was offered a sentence of 40 to 80 years' imprisonment in exchange for her guilty plea to third-degree murder. Insisting Meidinger was at least as culpable as he was, while being less cooperative, appellant contends there is no basis for the differential treatment. Appellant suggests he received harsher treatment on racial and/or gender grounds: he is an African-American male, while Meidinger is a white female.

The Commonwealth emphasizes that Meidinger testified at the trials of appellant, Smyrnes, and Marinucci, without any incentive offered for her cooperation, as well as her expressions of remorse and regret, as factors that weighed in favor of agreeing to a plea bargain with her. The Commonwealth further stresses it was uncontested that, although all codefendants were charged with first-degree murder as principals and accomplices, appellant and Smyrnes alone inflicted the stab wounds upon the victim.

---

[10] Appellant does not suggest he raised the claim before the hearing.

The Commonwealth asserts there is no unconstitutional disparity between the sentences of appellant and Meidinger.

The trial court noted, while a sentencing court must articulate its reasons for imposing different sentences upon codefendants, that practice was inapplicable here because appellant's sentencing occurred before that of his codefendants, and before his death sentence was determined by a jury. *See* Tr. Ct. slip op. at 24-25, *quoting Commonwealth v. Sinwell*, 457 A.2d 957, 960 (Pa. Super. 1983). The court also disagreed with appellant's characterization of Meidinger as "equally or more culpable." *Id.* at 25. The court stressed that Meidinger testified against three codefendants at separate trials without any promise of leniency. The court, having presided at these trials, observed "her demeanor and her very obvious remorse, regret and anguish each time she testified." The court concluded Meidinger's cooperation was "remarkable under the circumstances" and it thus held a death sentence in appellant's case was not arbitrary, capricious, or disproportionate. *See id.* at 25-26.

As appellant concedes, although this Court previously was required to conduct statutory proportionality review on direct capital appeals under 42 Pa.C.S. §9711(h)(3)(iii), the General Assembly repealed proportionality review in 1997. *See* Act of June 25, 1997, No. 28, §1. Nevertheless, the statute still requires this Court to review a sentence of death on direct appeal to ensure it was not a product of passion, prejudice or any other arbitrary factor. *See* 42 Pa.C.S. §9711(h)(1), (3). In light of this separate command, and the fact the Commonwealth's response is confined to the merits, we deem the present claim cognizable.

In *Commonwealth v. Haag*, 562 A.2d 289 (Pa. 1989), this Court rejected an argument similar to the claim appellant makes here. Haag argued his death sentence

was arbitrary and capricious given other participants in his crime did not receive death sentences. In rejecting the claim, we explained:

> When sentencing one who has been convicted of crime, it is of no relevance that another defendant has been acquitted on charges arising from the same crime. Further, we have repeatedly rejected the argument that a death sentence for an accomplice to a murder is arbitrary and disproportionate where the trigger man received a sentence of life imprisonment. *Commonwealth v. Frey*, [ ] 475 A.2d 700 ([Pa.] 1984), *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984).
>
> Sentencing is a highly individualized matter, which takes into account a multitude of factors pertaining to each defendant's character, record, and participation in [the] crime. The aggravating and mitigating circumstances applicable to different defendants involved in the same crime are variable as well, and, even where they are substantially similar, fine qualitative differences may warrant different sentences. Sentencing does not involve a rigid and mechanical application of aggravating and mitigating factors. [*Id.*] at 708. Jurors are expected to exercise their discretion in a manner that applies their wisdom and experience, making judgments about a defendant's character and the warranted punishment. These factors do not render a sentence arbitrary, even where a co-defendant has received a different sentence. *Id.*

*Haag*, 562 A.2d at 299. *See also Commonwealth v. Lesko*, 15 A.3d 345, 399 (Pa. 2011) ("While evidence that a capital defendant played a lesser role in the murder than a confederate may be relevant evidence in mitigation, the sentence received by a criminal confederate is not, especially given the individualized nature of sentencing. The sentences received by confederates are not probative of specific statutory mitigators, nor are they relevant evidence respecting the defendant's character or record or the circumstances of the offense itself, which states must permit."). *Accord Commonwealth v. Williams*, 896 A.2d 523, 547 (Pa. 2006) ("This Court has routinely rejected the argument that the criminal disposition of a defendant's cohorts has any relevance in mitigation to a defendant's own punishment.").

Appellant never discusses this line of cases. The comparative factors he cites are not relevant to a capital sentencing proceeding. Nor, at least as a general matter,[11] can they serve as a basis to immunize a defendant otherwise statutorily eligible to face a capital prosecution. We have explained that:

> Our capital sentencing scheme encompasses two separate decisions, one governing eligibility and one governing selection. *See Commonwealth v. Trivigno,* 561 Pa. 232, 750 A.2d 243, 257 (2000) (Saylor, J., joined by Zappala and Cappy, J., concurring) (citing *Tuilaepa v. California,* 512 U.S. 967, 971, 114 S.Ct. 2630, 2634, 129 L.Ed.2d 750 (1994)).

>> In the eligibility determination, the statutory scheme must narrow the class of persons for whom the death penalty applies and justify the imposition of such penalty as compared to others found guilty of murder. *See Lowenfield v. Phelps,* 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988). One means of narrowing the class is by prescribing aggravating circumstances that must exist before the death penalty can be imposed, which serves to appropriately channel the sentencer's discretion. *See Blystone v. Pennsylvania,* 494 U.S. 299, 306–07, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255 (1990). The selection decision is implicated when the sentencer decides whether a defendant who is eligible for the death penalty should in fact receive that sentence. *See Tuilaepa,* 512 U.S. at 972, 114 S.Ct. at 2635.

> [*Trivigno,*] 750 A.2d at 258. In Pennsylvania, of course, the Sentencing Code narrows the class of eligible person through a list of specific aggravating circumstances. *See* 42 Pa.C.S. § 9712(d) (specifying eighteen aggravating circumstances).

*Boczkowski*, 846 A.2d at 101. In this case, appellant does not dispute there was factual support for the aggravators establishing his eligibility for a death sentence, and the

---

[11] We offer this caveat because appellant's claim of a race- and/or gender-based motive in the prosecutor's decisions respecting appellant and Meidinger is premised upon inferences he derives from bald and select facts. We do not face, or pass upon, for example, a claim grounded in empirical evidence of a systemic pattern of racial or gender discrimination in the prosecuting office's actions in capital cases generally.

statutory scheme reposes authority in the factfinder to then make the selection decision, focusing on circumstances specific, indeed unique, to appellant. There is no basis for appellant's claim that some external consideration can foreclose this individualized sentencing scheme, by essentially obliging the prosecutor to negotiate a non-capital sentence.

Moreover, even if there were a constitutional requirement that a prosecutor's plea decisions in capital cases involving codefendants be justified, we see no error in the trial court's finding there were material differences between the codefendants. Although all codefendants were charged as both principals and accomplices, appellant and Smyrnes, the two to receive death sentences, distinguished themselves in depravity by stabbing the victim all had agreed to torture and kill. Appellant stabbed the victim multiple times in the chest, then sliced her neck open, and left her gasping, announcing she was not yet dead. After Smyrnes slit the victim's wrists, appellant helped to finish the gruesome task by choking the victim with Christmas lights. As blameworthy as Meidinger was, there was a rational basis to distinguish appellant, including the trial court's firsthand observation of Meidinger's expressions of remorse.

Accordingly, should the prosecutor determine to pursue the death penalty again upon remand, there is nothing in the present argument to preclude that decision.

## V. Other Issues

In our review of this record and appeal, we noted other issues which, although they may not independently have required a new penalty hearing, nevertheless

provided cause for concern.  To provide guidance, we will briefly address these issues, which may recur upon remand.[12]

**- A -**

### Issues III. - VI. In Brief: Admission of Appellant's Prison Records and Videotape to Rebut Character Evidence

These four claims derive from the Commonwealth's introduction of appellant's prison disciplinary record and videotaped footage of his conduct during a search of his prison cell, offered in rebuttal of character evidence appellant proffered in mitigation. Appellant presented the penalty phase testimony of family and friends to show his good character — that he was a caring, non-violent person who was more a follower than a leader, thus suggesting he followed Smyrnes's lead in torturing and murdering the victim.  In rebuttal, the Commonwealth presented the testimony of one of appellant's teachers, a lieutenant at the county prison where appellant was housed, and a warden at the same prison.  The lieutenant described a disciplinary incident during which he removed appellant from his cell while the cell was searched: appellant screamed

---

[12] Our discussion of these issues should not be read as expressing any view on them, or on sub-issues we do not discuss.  Furthermore, we recognize the concern of the concurring Justice(s) that our discussion of these additional issues is not essential to our mandate, given that we are remanding for a new penalty hearing on the issue involving the absence of a significant history of prior convictions.  However, having reviewed the entire record, and cognizant of the Court's special role as the direct review court in all capital cases, we respectfully believe there is some value in providing this guidance for remand in this particular instance.  *See Holt v. 2011 Legislative Reapportionment Comm'n*, 38 A.3d 711, 758-761 (Pa. 2012) (providing prospective guidance for remand to commission in direct review capacity); *Commonwealth v. Williams*, 732 A.2d 1167, 1176 (Pa. 1999) (Court remanded capital appeal matter for post-conviction trial court to write independent opinion addressing all issues; in interest of judicial economy; however, Court went on to "review the grounds for relief asserted to identify issues that will require additional consideration on the part of the PCRA court …").

profanities at him and threatened him and his family. N.T. Penalty Phase, 8/29/12, at 1653-64.

Over appellant's objection, the Commonwealth was then permitted to play a videotape of the search to corroborate the lieutenant's testimony. *Id.* at 1635-38, 1666. Also over appellant's objection, the warden was permitted to testify about disciplinary incidents involving verbal outbursts and acts of violence by appellant, reading from thirteen disciplinary reports prepared by others. *Id.* at 1679-82, 1687-98.

Among multiple points appellant raises respecting this rebuttal evidence are claims that he was given insufficient notice of the Commonwealth's intention to introduce the videotape and he was found not guilty of some of the infractions alleged in the disciplinary reports. Appellant argues the Commonwealth engaged in misconduct and violated his due process rights in failing to provide adequate notice of the videotape and by knowingly introducing evidence of infractions of which he was exonerated. The Commonwealth responds appellant had notice of the existence of the videotape from earlier discovery references and the Commonwealth was unaware of the defense strategy that would make the tape relevant until appellant produced evidence of good character at the hearing. As for the disciplinary reports, the Commonwealth avers appellant presented no evidence showing which information was incorrect and, in any event, the adjudicatory process following submission of the reports was irrelevant.

The trial court's opinion essentially credited the Commonwealth's argument respecting the videotape, but did not address appellant's claim of constitutional error in introducing evidence of incidents of misconduct of which he was exonerated.

If the issue of rebutting appellant's character evidence arises again at a new penalty hearing, we recognize the discovery-based aspects of this claim will not recur. Without addressing the various arguments respecting **admissibility** of the rebuttal

evidence, we merely caution the trial court to be more circumspect concerning the reports of prison misconduct, if it proves true certain accusations were not sustained, and separately to be cognizant that it may place appropriate limits upon the number of reports admitted to make the fairly simple point in rebuttal at issue.

**- B -**

**Issue X In Brief: Admission of Autopsy and Crime Scene Photographs**

A similar concern with assuring a more careful approach to evidence arises respecting this claim.

The photographic evidence introduced at the penalty hearing was extensive and, given the torture inflicted upon the victim, inherently disturbing. The jury was shown: numerous photographs of the crime scene, including the bathroom where the victim died, and photographs depicting bloodstain patterns revealed by a reagent; four photographs of the victim's body as it was discovered, bound with Christmas lights, wrapped in a plastic bag, and stuffed into a trash can; three close-up photographs of the victim's face (prior to the removal of nail polish), showing cuts, bruises, contusions, and abrasions, as well as the gashes in her neck from the knife; one close-up photograph of the stab wounds in the victim's bare chest; nine photographs of the victim's limbs and nude torso, showing cuts, bruises, contusions, and abrasions; one close-up photograph of the victim's face, after it had been cleaned, depicting cuts, bruises, contusions, abrasions, and her shorn head; two close-up photographs of the victim's shorn head and bloody head wounds; two close-up photographs of the victim's facial structure with the skin retracted; and one close-up photograph of the victim's heart, extracted from her body, depicting stab wounds. All of the photographs were in color.

In ruling on admissibility, the trial court considered the photographs' graphic content and suggested the Commonwealth briefly display them on the projector during

Dr. Wecht's testimony only. The court also suggested the photograph of the victim's face with her skin retracted be cropped to show only the wound. N.T. Penalty Phase, 8/17/12, at 33-36, 41-42. As it happened, however, not all suggestions were followed. The photographs were shown to the jury twice at trial — during the testimony of a detective and of Dr. Wecht, *see* N.T. Penalty Phase, 8/20/12, at 186-87 — and the jury was also permitted to view the photographs during its deliberations.[13] At the conclusion of the hearing, the court instructed the jurors on the purpose of the photos (to show the nature and extent of the wounds suffered) and cautioned them not to "let them stir up your emotions." N.T. Penalty Phase, 8/30/12, at 1822.

Appellant argues the trial court abused its discretion in allowing the jury to view the photographs because they were irrelevant and unfairly prejudicial. Appellant claims the photos were irrelevant because he had already pleaded guilty to stabbing the victim in the heart; they were inflammatory; and their evidentiary value did not outweigh the likelihood they would inflame the minds and passions of the jurors.

The Commonwealth responds the photographs were admissible to show the history and natural development of the case; to illustrate the testimony of Dr. Wecht and the detective regarding the extent of the injuries inflicted upon the victim; and to depict all of the non-life-threatening wounds suffered by the victim before the fatal stab wounds, to prove the torture aggravator. The Commonwealth claims the photographs were not inflammatory and their probative value outweighed any prejudicial effect.

---

[13] Although the transcript indicates the photograph of the victim's face remained uncropped, *see* N.T. Penalty Phase, 8/20/12, at 187-88, our review of the photo itself reflects black tape applied over all areas except the portion depicting the wound. The court noted on the record that the photographs were shown to the jury on the projector screen during Dr. Wecht's testimony for a "very, very brief period of time;" as soon as the witness answered the relevant question, the slide was taken down. N.T. Penalty Phase, 8/23/12, at 734.

The trial court noted *Commonwealth v. Eichinger*, 915 A.2d 1122, 1142 (Pa. 2007), addressed whether autopsy photographs of a victim are relevant at the penalty phase when the defendant pleaded guilty. The photographs were deemed relevant in *Eichinger* to inform the jury of the nature of the defendant's acts and the development of the case. Accordingly, the court reasoned, the photographs were relevant here, and particularly because they also addressed the torture aggravator. The court further stated, while some of the photographs were graphic and disturbing, they were not legally "inflammatory" and their probative value outweighed any prejudicial effect. Tr. Ct. slip op. at 43-44.

Decisions respecting the admissibility of photographic evidence of a murder victim's injuries rest in the discretion of the trial court, of course; an abuse of discretion, and resulting prejudice, must be shown to warrant appellate relief. *Commonwealth v. Ballard*, 80 A.3d 380, 393 (Pa. 2013), *citing Commonwealth v. Sanchez*, 36 A.3d 24, 48 (Pa. 2011). This Court is frequently presented with evidentiary issues involving autopsy photographs in capital cases, our guiding jurisprudence on the subject is well-developed, *see, e.g.*, *Ballard*, 80 A.3d at 392-93, and the trial court identified the guiding principles. Moreover, because the torture aggravator was implicated in this case, we recognize photographic evidence was relevant to illustrate the testimony of Dr. Wecht and the detective regarding the extent of the non-fatal injuries inflicted upon the victim prior to administration of the ultimately fatal wounds. *See* N.T. Penalty Phase, 8/20/12, at 182-98; N.T. Penalty Phase, 8/23/12, at 678-96. On the other hand, we also recognize that, as is invariably the case in murder prosecutions involving knives and torture, the photographs here are graphic and gruesome. The photographs from the internal examination of the victim were especially bloody and graphic as they depicted the underlying tissues in her face and torso; they were introduced to illustrate Dr.

Wecht's testimony that the force of the blows inflicted on the victim caused extensive internal hemorrhaging beneath her scalp and between her ribs. Likewise, the photograph of the victim's heart, showing the stab wounds, pertained to how the victim died, which was part of the case's history. *See* N.T. Penalty Phase, 8/23/12, at 697-701.

On remand we suggest the parties and the court take stricter measures to mitigate the potential for a prejudicial effect upon the jury. The testimonial description of the acts committed by the conspirators, and the description of her injuries by Dr. Wecht and the detective vividly display the victim's suffering. As our cases recognize, this is not to say the trial has to be sanitized to the point where no photographs can or should be admitted. But, care can be taken not to allow the presentation to go to unnecessary extremes. This is not a case where the defendant seriously contested the existence of the torture aggravator; indeed, appellant's counsel never argued against torture in his closing. In addition, the trial court recognized certain measures should be taken to limit the jury's exposure to the photographs but, for some reason, they were not followed, as the jury saw the photographs twice during the trial, and also had them in deliberations.

*Ballard*, which was decided after the trial in this case, offers a useful contrast. In *Ballard*, the trial court required the photographs to be in black and white, excluded those it found redundant or overly gruesome, admitted only those inflammatory photographs that had essential evidentiary value that it seemed to outweigh any prejudicial impact, and issued a cautionary instruction. *Ballard*, 80 A.3d at 393-94. We suggest the trial court should take proactive measures to ensure a more judicious narrowing of the photographic evidence.

Finally, in further support of the above, we refer the parties and the trial court to a recent dissenting opinion by Chief Justice Saylor in a case, like *Ballard*, decided after

the trial in this matter. In *Commonwealth v. Woodard*, 129 A.3d 480 (Pa. 2015), color photographs of the nude, battered body of a two-year-old murder victim were introduced as relevant to proving specific intent. In his dissent, the Chief Justice noted psychological studies suggesting graphic photographs may "have a substantial effect on jurors in terms of fostering anger, shallower mental processing, greater reliance on shortcuts and stereotypes, and enhanced certainty even in the absence of any material probative contribution of the photographic evidence in question." *Id.* at 510-11 (Saylor, C.J., dissenting), *citing* Susan A. Bandes & Jessica M. Salerno, *Emotion, Proof and Prejudice: The Cognitive Science of Gruesome Photos and Victim Impact Evidence*, 46 ARIZ. ST. L.J. 1003, 1026-27, 1045-48 (2014), *citing*, *inter alia*, D.A. Bright & J. Goodman-Delahunty, *Gruesome Evidence and Emotion: Anger, Blame, and Jury Decision-Making*, 30 LAW & HUM. BEHAV. 183 (2006), and Jennifer S. Lerner & Larissa Z. Tiedens, *Portrait of the Angry Decision Maker: How Appraisal Tendencies Shape Anger's Influence on Cognition*, 19 BEHAV. DECISION MAKING 115, 122 (2006)). Among other points, the Chief Justice observed evidence jurors probably are not consciously aware of such emotional influence "rais[es] questions about the ameliorative effect of limiting instructions issued by trial judges." *Id.* at 511 (citation omitted).

## VI. Conclusion

For the foregoing reasons, we vacate the judgment of sentence of death, and remand the case for a new penalty hearing. Jurisdiction relinquished.

Chief Justice Saylor and Justice Donohue join the opinion in full. Justices Baer and Todd join the opinion, except with respect to Part V.

Justice Baer files a concurring opinion.

Justice Todd files a concurring opinion.

Justice Mundy files a dissenting opinion.

Justice Wecht did not participate in the consideration or decision of this case.