**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 775 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Sentence entered on November 15, |
| | : | 2018 (Post-Sentence motions |
| v. | : | denied February 28, 2019) in the |
| | : | Court of Common Pleas, |
| | : | Westmoreland County, Criminal |
| MELVIN KNIGHT, | : | Division, at No. CP-65-CR-0000851- |
| | : | 2010. |
| Appellant | : | |
| | : | SUBMITTED: March 17, 2020 |

**OPINION**

**JUSTICE TODD**                                         **DECIDED: November 18, 2020**

Melvin Knight appeals the judgment of sentence of death imposed by the Westmoreland County Court of Common Pleas following his second penalty trial for his role in the 2010 torture and murder of Jennifer Daugherty ("the Victim"), a 30–year-old intellectually disabled woman. For the reasons that follow, we affirm Appellant's judgment of sentence.

## I. Background

This Court set forth the disturbing facts of this case in our opinion disposing of Appellant's appeal from his first judgment of sentence:

> The evidence revealed that, on February 8, 2010, appellant and his pregnant girlfriend [Amber] Meidinger were at the Greensburg, Pennsylvania bus station when appellant noticed codefendant Ricky Smyrnes. Smyrnes was there with the victim and the other codefendants, Angela Marinucci, Robert

Masters, and Peggy Miller. The victim, who had the intellectual capacity of a fourteen-year-old, had taken a bus to Greensburg to attend a doctor's appointment the next day and intended to stay at Smyrnes's apartment. Meidinger recognized the victim from a facility they both attended that provided services to clients with mental disorders and disabilities. In conversation with Meidinger, the victim said she was going to marry Smyrnes; Meidinger noticed tension between the victim and Marinucci after Marinucci overheard the remark.

Marinucci accompanied appellant and Meidinger to their hotel and confided she was in a relationship with a married man; Meidinger eventually learned Smyrnes was the man. At the hotel, Meidinger overheard Marinucci tell Smyrnes during a phone conversation, "[Y]ou better not be with that bitch[,]" referring to the victim. N.T. Penalty Phase, 8/22/12, at 535. Meidinger and appellant later joined Smyrnes at his apartment, where Masters and Miller were also present. Smyrnes invited appellant and Meidinger to stay the night. The victim arrived and later attempted to be intimate with Smyrnes, who rebuffed her and became angry with her.

The next day, the victim decided not to go to her doctor to get her medication, which angered Smyrnes and appellant. While the victim showered, Smyrnes phoned Marinucci and told her about the victim's sexual advances the prior evening. Marinucci responded, "nobody is having sex with my man." *Id.* at 552. Going forward, the conspirators engaged in a continuing course of abusing the victim.

The conspirators first bullied the victim by taking things from her purse and pouring mouthwash on her purse and clothing. They then hit the victim on the head repeatedly with empty soda bottles, until appellant grabbed her, knocked her into a wall, and began choking her until the victim fell to the floor crying.

Later, Marinucci arrived, still distressed about the victim's advances toward Smyrnes. Marinucci and Meidinger accosted the victim in the bathroom. Marinucci pushed her into a metal towel rack three times and struck her in the chest and head. After the victim denied any interest in Smyrnes, Meidinger shoved her into the towel rack three times, causing her to strike her head. Appellant then dragged the victim into the living room, where he and Smyrnes dumped spices and

oatmeal on her head after Marinucci poured water on her. Smyrnes then directed the victim to shower.

After the victim showered, appellant brought her out of the bathroom, forced her to remove her clothes, and threw them out of the window. With Smyrnes's help, appellant cut off the victim's hair, made her clean it, then took her into the living room and stuffed a sock into her mouth. Thereafter, appellant raped her.

After Marinucci decided to spend the night, appellant, Meidinger, and Smyrnes accompanied her to her house to retrieve her prescription medication. Smyrnes instructed Masters and Miller to remain with the victim and not let her leave. As the foursome was returning to the apartment, Miller called and related that the victim was trying to depart. Upon arrival, the group beat the victim, gave her some of Marinucci's medication, and left her in the living room while they went to bed.

The following morning, a dispute over soda led Marinucci to push the victim to the floor and hit her. In defense, the victim kneed Marinucci in the stomach, causing Marinucci to report to Smyrnes that the victim had killed her baby (in fact, Marinucci was not pregnant). Smyrnes confronted the victim, demanding, "[I]f you want to kill my kid, why should I let you live[?]" *Id.* at 596. Marinucci insisted that Smyrnes choose between her and the victim, leading Smyrnes to call a "family meeting" and ask the others' opinions regarding what kind of mother the victim would be. At this point, the victim appeared to be "out of it," having been beaten, raped, and drugged. *Id.* at 600.

Following a second "family meeting," appellant put the victim in the bathroom, and Meidinger hit her in the head with a towel rack to force her to drink Marinucci's urine from a cup. The victim gagged into the toilet. Meidinger repeated this action with a second concoction containing feces and urine, striking the victim in the head with the towel rack until she obeyed, again gagging. Meidinger and appellant made a third foul mixture containing powdered detergent, water, and some of Meidinger's prescription medication, which Meidinger forced upon the victim, again hitting her in the head with the towel rack until she consumed it and vomited.

The torture continued unabated. Appellant took the victim into the living room, where he and Smyrnes bound her feet with Christmas lights. When the lights did not function, Smyrnes, appellant, and Meidinger removed the bulbs and tied the victim's ankles and wrists with the empty strings, adding Christmas garland around her ankles. During this time, Miller's nail polish was applied to the victim's face. Smyrnes called a third "family meeting" and inquired whether they should kill the victim. After the "family" voted to kill, Smyrnes forced the victim to write a suicide note and told her the conspirators were going to make her death look like a suicide to avoid being held responsible.

Appellant took a knife from Smyrnes, who told him, "You know what to do." *Id.* at 636. Appellant and Meidinger took the victim to the bathroom, forced her to her knees, turned off the light, and shut the door. Appellant asked Meidinger if she was ready, and she replied she was. After appellant put something in the victim's mouth to keep her silent, he asked her if she was ready to die, then stabbed her in the chest multiple times, and stabbed and sliced her neck. As the victim lay gasping, appellant exited the bathroom and announced she was not dead yet. Marinucci said to kill her, that she wanted her "out of here." *Id.* at 617. Smyrnes took the knife and cut the victim's wrists, after which he and appellant choked the victim with the Christmas lights.

After the victim perished, Smyrnes called another "family meeting" to decide what to do with her body. Ultimately, Smyrnes and appellant left the apartment with the victim's body in a plastic bag inside a garbage can. Upon returning, they told the others they had left the can under a truck. The conspirators then went to bed.

The victim's body was discovered later that morning by a man who found the garbage can underneath his work truck in a middle school parking lot. He contacted police, who launched an investigation, and the victim's body was identified. Dr. Cyril Wecht, the forensic pathologist who performed an autopsy on the body, received the body while it was still in the garbage can—placed head first, partially covered with plastic bags, with Christmas lights wrapped around the neck and wrists, and a decorative material binding the ankles. The body had suffered multiple incised wounds, abrasions, and contusions, and several prescription drugs were found in the victim's system. Dr. Wecht concluded the cause of death was a

> combination of all of the injuries, but was primarily due to stab
> wounds of the chest, which penetrated the left lung and went
> into the heart, producing a substantial hemorrhage. Dr. Wecht
> opined these injuries were inflicted shortly before death, with
> the intent to cause pain and suffering: the victim would have
> remained conscious after the initial infliction of the wounds,
> bled for a couple of minutes, lost consciousness, and finally
> died within four to six minutes.

*Commonwealth v. Knight*, 156 A.3d 239, 241-43 (Pa. 2016) (footnotes omitted).

Appellant pleaded guilty to first-degree murder, second-degree murder, conspiracy to commit murder, kidnapping, and conspiracy to commit kidnapping.[1] At Appellant's first penalty phase trial, the Commonwealth pursued two aggravating circumstances: the killing was committed while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); and the killing was committed by means of torture, *id.* § 9711(d)(8). Appellant asserted four mitigating circumstances, including no significant history of prior criminal convictions, 42 Pa.C.S. § 9711(e)(1); his age at the time of the crime, *id.* § 9711(e)(4)[2]; extreme duress, *id.* § 9711(e)(5); and the "catch-all" mitigator, *id.* § 9711(e)(8). The jury found that the Commonwealth established both aggravating circumstances, and that Appellant established the catch-all mitigating circumstance; it concluded, however, that the aggravators outweighed the mitigating circumstances, and thus recommended that Appellant be sentenced to death. *See* 42 Pa.C.S. § 9711(c)(1)(iv).

On direct appeal, Appellant raised fourteen issues for this Court's review, including a challenge to the jury's failure to find as a mitigating circumstance Appellant's lack of a significant history of prior criminal convictions. In addressing this claim, this Court observed that it was undisputed that Appellant had no prior felony or misdemeanor convictions, a fact to which the prosecutor conceded during closing argument. *Knight*, 156 A.3d at 245. Relying on *Commonwealth v. Rizzuto*, 777 A.2d 1069 (Pa. 2001),

---

[1] 18 Pa.C.S. § 2502(a); 2502(b); 903(a)(1); 2901(a)(3); and 903(a)(1), respectively.

[2] Appellant was 20 years old at the time of the crime.

*abrogated on other grounds by Commonwealth v. Freeman*, 827 A.3d 385 (Pa. 2003), wherein this Court ordered a new penalty hearing because the jury did not find the (e)(1) mitigator despite the parties' stipulation to its existence, we concluded that the jury herein was obliged to find the (e)(1) mitigator, and should have been directed to do so by the trial court. Accordingly, on November 22, 2016,[3] we granted Appellant a new penalty trial on this basis.

In May 2017, prior to his second penalty trial, Appellant filed a pre-trial motion asserting, *inter alia*, that the death penalty in Pennsylvania is unconstitutional. Appellant also sought to preclude at trial the admission of autopsy photographs of the Victim, and evidence related to the Victim's mental health deficits. In June 2017, Appellant filed notice of his intent to assert an *Atkins*[4] defense based on his own alleged intellectual disability. In another pretrial motion filed in October 2018, Appellant sought to utilize the Colorado *voir dire* method of jury selection, discussed *infra*, which the trial court denied. The trial court also denied Appellant's proposed jury instruction regarding his *Atkins* defense.

Appellant's second penalty trial began on November 5, 2018 and concluded on November 15, 2018. The jury found the (d)(6) aggravator (the killing was committed while in the perpetration of a felony), citing both the felonies of kidnapping and aggravated assault; and the (d)(8) aggravator (the killing was committed by means of torture). 42 Pa.C.S. § 9711(d)(6), (8). The jury found as mitigating circumstances Appellant's lack of a significant history of prior criminal convictions, § 9711(e)(1); the fact that Appellant was under the influence of extreme mental or emotional disturbance, § 9711(e)(2); and that Appellant acted under extreme duress or under the substantial dominion of another person, § 9711(e)(5). The jury determined that the aggravating circumstances

---

[3] In his brief, Appellant incorrectly states that this Court granted him a new penalty trial on March 10, 2017. *See* Appellant's Brief at 4.
[4] *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).

outweighed the mitigating circumstances, and thus recommended that Appellant be sentenced to death. In accordance with 42 Pa.C.S. § 9711(c)(1)(iv), which requires that a trial court impose a sentence of death where the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances, the trial court imposed a sentence of death. Following the denial of his post-sentence motions, Appellant filed a notice of appeal, and the matter is once again before this Court.

## II. Analysis

### A. Challenge to Pennsylvania's Death Penalty Statute

In his first claim, Appellant contends that "[t]he Death Penalty in Pennsylvania constitutes cruel punishment and should be abolished." Appellant's Brief at 9. Characterizing himself as a "20-year old mentally impaired African American male at the time of the murder," Appellant argues that his sentence of death violates his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and under Sections 6, 9, and 13 of Article I of the Pennsylvania Constitution. Appellant's Brief at 9.

Although Appellant asserts that he raised this argument in his pretrial motion of May 19, 2017, Appellant neglects to set forth in his brief to this Court the text of any of the constitutional provisions upon which he now relies. Appellant also fails to offer any argument as to why his capital sentence violates those constitutional provisions. Instead, Appellant quotes at length from the brief of the Philadelphia County District Attorney's Office filed in response to the petitions for extraordinary relief under this Court's King's Bench authority ("King's Bench petitions") in an unrelated case by Jermont Cox and Kevin Marinelli, which challenged the administration of capital punishment in Pennsylvania following the 2018 release of a report by the Joint State Government Commission

("Report"). *See* Brief of Philadelphia District Attorney's Office in *Cox v. Commonwealth*, 102 & 103 EM 2018, 218 A.3d 384 (Pa. Sept. 26, 2019) (order).[5]

In response, the Commonwealth observes that Pennsylvania's death penalty statute was held constitutional under both the United States and Pennsylvania Constitutions in *Commonwealth v. Zettlemoyer*, 454 A.2d 937 (Pa. 1982). The Commonwealth acknowledges that this Court has, in the past, heard challenges to the constitutionality of Section 9711 as applied to a specific defendant, *see Commonwealth v. Means*, 773 A.2d 143 (Pa. 2001), but notes that, in *Means*, the appellant challenged the *process* of imposing the penalty, not the penalty itself. Finally, the Commonwealth argues that, because Appellant fails to develop his argument that there is not a compelling penological justification for the death penalty, and instead simply reproduces the arguments from the King's Bench petitions in *Cox*, Appellant has waived this issue.

Preliminarily, we note that, on September 26, 2019, this Court issued an order denying the applications in both *Cox*, declining to exercise our King's Bench jurisdiction. *See Cox, supra*. Accordingly, Appellant's reliance on the arguments of the parties in those cases is not helpful to his position.

Moreover, in *Commonwealth v. Briggs,* 12 A.3d 291 (Pa. 2011), this Court specifically condemned the practice of incorporating by reference in an appellate brief a brief authored by another attorney. In *Briggs*, the appellant argued that Pennsylvania's death penalty statute violated his rights under Sections 6, 9, and 13 of Article I of the Pennsylvania Constitution, and the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. However, instead of providing a coherent argument for each of his claims, with proper citations to relevant case law, the appellant attempted to incorporate by reference a brief authored by another attorney, which the appellant

---

[5] The petitions of Cox and Marinelli were consolidated for disposition.

appended to his motion in the trial court and attached as an appendix to the brief he filed with this Court.

We explained that such "incorporation by reference" is an unacceptable manner of appellate advocacy for the proper presentation of a claim for relief to our Court." *Id.* at 342. We further stated:

> Our rules of appellate procedure specifically require a party to set forth in his or her brief, in relation to the points of his argument or arguments, "discussion and citation of authorities as are deemed pertinent," as well as citations to statutes and opinions of appellate courts and "the principle for which they are cited." Pa.R.A.P. 2119(a), (b). Therefore our appellate rules do not allow incorporation by reference of arguments contained in briefs filed with other tribunals, or briefs attached as appendices, as a substitute for the proper presentation of arguments in the body of the appellate brief. Were we to countenance such incorporation by reference as an acceptable manner for a litigant to present an argument to an appellate court of this Commonwealth, this would enable wholesale circumvention of our appellate rules which set forth the fundamental requirements every appellate brief must meet. *See, e.g.,* Pa.R.A.P. 2135(a)(1) (establishing length of principal brief at no greater than 70 pages); *Commonwealth v. (James) Lambert,* 568 Pa. 346, 356 n. 4, 797 A.2d 232, 237 n. 4 (2001) (Opinion Announcing Judgment of the Court) (refusing to consider claims not argued in the brief but incorporated by reference from motions made at trial and observing that "[t]o permit appellant to incorporate by reference his previous motions would effectively allow him to more than double the original briefing limit."). The briefing requirements scrupulously delineated in our appellate rules are not mere trifling matters of stylistic preference; rather, they represent a studied determination by our Court and its rules committee of the most efficacious manner by which appellate review may be conducted so that a litigant's right to judicial review as guaranteed by Article V, Section 9 of our Commonwealth's Constitution may be properly exercised. Thus, we reiterate that compliance with these rules by appellate advocates who have any business before our Court is mandatory. Consequently, since Appellant has failed to develop or present a proper argument with respect to these

constitutional claims, we find them waived in this direct appeal.

*Id.* at 343 (footnotes omitted); *see also Commonwealth v. Perez*, 93 A.3d 829 (Pa. 2014) (appellant's failure to cite case law or provide argument in support of his challenge to the death penalty as cruel and unusual punishment, and unconstitutional, rendered his claim waived for purpose of appeal); *Commonwealth v. Walter*, 966 A.2d 560 (Pa. 2009) (appellant waived her constitutional claim regarding the death penalty by failing to cite case law or provide any argument).

As Appellant's brief is devoid of original argument regarding the constitutionality of Pennsylvania's death penalty statute, and instead consists of a near verbatim reproduction of the argument of the Philadelphia County District Attorney's Office set forth in its response to the King's Bench petitions in *Cox* and *Marinelli*, which, as noted above, this Court denied, we hold that Appellant has waived his challenge to the constitutionality of Pennsylvania's death penalty statute.

## B. *Atkins* Instruction

Appellant next argues that the trial court erred in denying his request for a jury instruction pursuant to Pennsylvania Suggested Standard Criminal Jury Instruction 15.2502F.2,[6] also referred to as an *Atkins* instruction. An *Atkins* instruction advises the jury that a defendant who is determined to be intellectually disabled is not eligible for the death penalty. In *Atkins,* the United States Supreme Court held that the Eighth Amendment to the United States Constitution prohibits the imposition of the death penalty upon individuals with intellectual disabilities. 536 U.S. at 32. However, the *Atkins* Court "left the determination of how to apply the ban on the execution of mentally retarded defendants convicted of capital crimes to the individual states." *Commonwealth v. Miller,* 888 A.2d 624, 629 (Pa. 2005).

---

[6] Pa. SSJI (Crim), § 15.2502F.2.

We considered in *Miller* the definition of intellectual disability used by the American Association of Mental Retardation ("AAMR"), now the American Association on Intellectual and Developmental Difficulties ("AAIDD"), and the American Psychiatric Association ("APA") standard set forth in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1992) ("DSM–IV"). The AAMR defines intellectual disability as a "disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in the conceptual, social, and practical adaptive skills." *Miller*, 888 A.2d at 629–30 (quoting Mental Retardation: Definition, Classification, and Systems of Supports 1 (10th ed. 2002)). The APA's definition, as set forth in the DSM–IV, defines "mental retardation" as "significantly subaverage intellectual functioning (an IQ of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning." *Miller,* 888 A.2d at 630 (quoting DSM–IV at 37).

We noted in *Miller* that the above definitions share three concepts: limited intellectual functioning, significant adaptive limitations, and onset prior to age 18. Regarding the concept of limited intellectual functioning, we explained:

> Limited or subaverage intellectual capability is best represented by IQ scores, which are approximately two standard deviations (or 30 points) below the mean (100). The concept should also take into consideration the standard error of measurement (hereinafter "SEM") for the specific assessment instruments used. The SEM has been estimated to be three to five points for well-standardized measures of general intellectual functioning. Thus, for example, a subaverage intellectual capability is commonly ascribed to those who test below 65–75 on the Wechsler scales.

*Id.* at 630 (citations omitted).

Recognizing that, pursuant to both the AAMR and DSM–IV, a low IQ score is not, in and of itself, sufficient to support a classification of intellectually disabled, we

considered the factors relevant to the second prong – the existence of limitations in adaptive behavior:

> Adaptive behavior is the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives, and limitations on adaptive behavior are reflected by difficulties adjusting to ordinary demands made in daily life. The AAMR recommends that such limitations should be established through the use of standardized measures. "On these standardized measures, significant limitations in adaptive behavior are operationally defined as performance that is at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills."

*Id.* at 630–31 (citations and footnote omitted). Under the AAMR, conceptual skills include, *inter alia*, language, reading, and writing abilities, and the understanding of money, time, and number concepts; social skills include, *inter alia*, interpersonal skills, social responsibility, and the ability to follow rules; and practical skills include, *inter alia*, personal care, travel and transportation, meal preparation, and money management. *Id.* at 630 n. 8.

This Court did not discuss at length in *Miller* the third concept — age of onset — stating, "[w]e see no need to explore the concept of age of onset further, since this requirement is self explanatory and both the AAMR and the DSM–IV require that the age of onset be before age 18." *Id.* at 630 n.7.

In sum, we stated:

> What is clear from the above is that [the AAMR and the DSM–IV] definitions are very similar and diagnosis under either system of classification takes into account like considerations. Therefore, we hold that a PCRA petitioner may establish his or her mental retardation under either classification system and consistent with this holding, assuming proper qualification, an expert presented by either party may testify as to mental retardation under either classification system.

> Moreover, consistent with both of these classification systems, we do not adopt a cutoff IQ score for determining mental retardation in Pennsylvania, since it is the interaction between limited intellectual functioning and deficiencies in adaptive skills that establish mental retardation.

*Id.* at 631.

In *Commonwealth v. Sanchez*, 36 A.3d 24 (Pa. 2001), this Court held that a "colorable *Atkins* issue" should be submitted to the jury for a penalty phase decision. *Id.* at 62. However, "an *Atkins* claim is not properly for the factfinder unless there is competent evidence to support the claim, under the standard announced in *Miller*." *Id.* at 62 n.19.

In the case *sub judice*, the Commonwealth objected to Appellant's request for an *Atkins* instruction on the basis that the defense failed to meet the three-prong test to establish intellectual disability, as set forth by this Court in *Miller* and *Sanchez*. Specifically, the Commonwealth argued that Appellant failed to present evidence of a test demonstrating that Appellant's IQ was in the range of 65 to 75 prior to age 18.

In its February 28, 2019 Opinion and Order denying Appellant's post-sentence motions ("Trial Court Opinion"), the trial court acknowledged that "there was evidence introduced that [Appellant] had limitations in his adaptive functioning that arose prior to the age of 18." Trial Court Opinion, 2/28/19, at 41. However, it noted that "only one IQ score of 75 was introduced into evidence, which was not relied upon by either party as a reliable result." *Id.* As recognized by Appellant, this is because his IQ score of 75 was not documented prior to age 18, as required under *Miller*. Appellant's Brief at 16.

Further, the trial court observed that Appellant's own experts conceded that his IQ score did not meet the criteria for a determination that he was intellectually disabled under *Atkins.* The trial court recounted, for example, that defense expert Dr. Christine Nezu, a clinical psychologist, testified that, while Appellant's adaptive functioning was below average and in the impaired range, he did not meet the requirements for a finding of

intellectual disability under *Atkins*, notwithstanding the fact that Appellant scored a 75 on a test performed while Appellant was incarcerated in 2012, at age 23. Trial Court Opinion, 2/28/19, at 41. The trial court further observed that defense expert Dr. Joette James, a clinical neuropsychologist, testified that she performed an IQ test on Appellant in 2018, which resulted in an overall score of 77, the same score indicated by Appellant's first IQ test performed when he was almost eight years old. *Id.* at 42. Accordingly, the trial court concluded that, because Appellant failed to demonstrate that his IQ fell within the impaired range required to establish intellectual disability under *Miller* and *Sanchez*, an *Atkins* instruction would have been inappropriate. *Id.*

In his brief, Appellant "acknowledges that on cross-examination of both psychological experts, the prosecution elicited testimony from both Dr. James . . . and Dr. Nezu . . . that the Appellant did not meet the IQ requirement of *Sanchez* . . . and thus could not technically be considered 'intellectually disabled' pursuant to current Pennsylvania case law." Appellant's Brief at 12. However, he quotes at length the expert testimony which, in his view, establishes his *adaptive* deficits. Moreover, Appellant contends that the trial court should have given an *Atkins* instruction based on his belief that this Court should revisit the IQ requirement set forth in *Miller* and *Sanchez* in light of the subsequent decisions by the United States Supreme Court in *Hall v. Florida*, 572 U.S. 701 (2014), and *Moore v. Texas*, 137 S.Ct. 1039 (2017).

In *Hall,* the high Court, in a 5-4 decision, struck down Florida legislation which provided that defendants who had an IQ score above 70 had no right to relief under *Atkins* and were precluded from presenting any further evidence of intellectual disability.[7] The

---

[7] As the Court explained in *Hall*,

> The mean IQ test score is 100. The concept of standard deviation describes how scores are dispersed in a population. Standard deviation is distinct from standard error of measurement, a concept which describes the reliability of a

Court determined that Florida's strict cutoff of 70, which did not account for the standard error of measurement ("SEM") of five points on either side of the score, violated the Eighth Amendment's prohibition on cruel and unusual punishment, and it held, in accordance with *Atkins*, that defendants who have an IQ score that falls within a range that accounts for the SEM, which in Hall's case was between 66 and 76 (Hall had documented IQ scores ranging from 71 to 80) − must be allowed to present additional evidence of intellectual disability regarding difficulties in adaptive functioning.

In *Moore*, the defendant had an adjusted IQ score of 74, which, taking into consideration the SEM, fell within the range of 69 to 79. The high Court determined that, because the lower range of the defendant's adjusted IQ fell at or below 70, the lower court was required to consider his adaptive functioning in determining whether he was intellectually disabled for purposes of *Atkins*. In so holding, the Court reiterated that, "in line with *Hall,* we require that courts continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits." 137 S. Ct. at 1050.

According to Appellant, the high Court's decisions in *Hall* and *Moore* warrant this Court's reconsideration of the requirements of *Sanchez* and *Miller.* We disagree. Notably, this Court has already declined to adopt a strict IQ score cutoff for determining intellectual disability, recognizing that "it is the interaction between limited intellectual

---

test. . . . The standard deviation on an IQ test is approximately 15 points, and so two standard deviations is approximately 30 points. Thus a test taker who performs "two or more standard deviations from the mean" will score approximately 30 points below the mean on an IQ test, *i.e.,* a score of approximately 70 points.

572 U.S. at 711.

functioning and deficiencies in adaptive skills" that establishes intellectual disability, *Miller*, 888 A.2d at 631, and that an IQ score falling within the range of 65 to 75 warrants consideration of intellectual disability. Thus, Pennsylvania's approach to determining intellectual disability is consistent with *Hall* and *Moore*.

As noted above, the trial court explained that it rejected Appellant's request for an *Atkins* instruction because Appellant failed to introduce any evidence of a documented IQ score of 75 or below prior to age 18. Appellant himself conceded this fact, and, as the trial court found, his own experts likewise conceded that he did not meet the criteria for a determination that he was intellectually disabled under *Atkins.* Accordingly, because Appellant failed to offer any evidence of an IQ score, documented prior to age 18, within the range established by *Miller* and *Sanchez*, the trial court was not required to provide an *Atkins* charge to the jury.

### C. Jury's Determination of Aggravating Circumstances

Appellant next contends that he is entitled to a new trial because "[t]he jury erroneously found three aggravating circumstances, when only two were sought by the prosecution." Appellant's Brief at 20. Appellant further argues that the jury improperly "used one aggravator, a killing committed during the course of a felony, two times, in balancing aggravators vs. mitigators," resulting in an unconstitutional weighing of the aggravating and mitigating circumstances. *Id.* at 21.

The Commonwealth acknowledges that it gave notice that it would pursue two statutory aggravators − that the killing was committed during the perpetration of a felony or felonies, 42 Pa.C.S. § 9711(d)(6), and that the offense was committed by means of torture, *id.* § 9711(d)(8). Commonwealth's Brief at 15. Further, in its instructions to the jury, the trial court explained: "These are the two aggravating circumstances alleged by the Commonwealth. First, that the killing was committed during the commission of a

felony, specifically, either kidnapping and/or rape and/or aggravated assault, and second, that the killing was committed by means of torture." N.T. 11/15/18, at 1174.

However, with respect to aggravating circumstances, the jury verdict slip provided, under "General Instructions," as follows:

> B. AGGRAVATING AND MITIGATING CIRCUMSTANCES PRESENTED TO THE JURY
>
> 1. The following aggravating circumstances are submitted to the jury and must be proved by the Commonwealth <u>beyond a reasonable doubt</u>:
>
> a. The defendant committed a killing while in the perpetration of a felony (kidnapping).
>
> b. The defendant committed a killing while in the perpetration of a felony (rape).
>
> c. The defendant committed a killing while in the perpetration of a felony (aggravated assault).
>
> d. The offense was committed by means of torture.

First Degree Murder Sentencing Verdict Slip at 1. (R.R. 265).

Additionally, on a section of the jury verdict slip titled "SENTENCING VERDICT AND FINDINGS," under a pre-printed line which read, "The aggravating circumstance(s) unanimously found (is) (are):" the jury hand-wrote the following:

> (1) The defendant committed a killing while in the perpetration of a felony (kidnapping). (2) The defendant committed a killing while in the perpetration of a felony (aggravated assault) (3) The offense was committed by means of torture.

*Id.* at 2.

Further, when the trial court requested the jury foreperson to read aloud the aggravating circumstances that the jury found unanimously, the jury foreperson stated:

> The aggravating circumstances unanimously are.

1. The Defendant committed a killing while in the perpetration of a felony kidnapping.

2. The Defendant committed a killing while in the perpetration of a felony aggravated assault.

3. The offense was committed by means of torture.

N.T. 11/15/18, at 1200-01.

Appellant suggests that the jury foreperson's reference to two separate felonies − kidnapping and aggravated assault − in addition to the torture aggravator, indicates that the jury improperly found *two* Section 9711(d)(6) aggravators, even though the prosecutor sought only one, and/or that the jury improperly considered the (d)(6) aggravator twice when balancing the aggravating and mitigating circumstances.

We conclude that Appellant has waived this issue for two reasons. First, Appellant did not raise the issue in his Statement of Matters Complained of on Appeal filed pursuant to Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure, and, second, Appellant failed to lodge an objection to the jury verdict form with the trial court. As noted above, the verdict slip specifically set forth the aggravating circumstances the Commonwealth submitted to the jury, including whether the killing was committed during the course of felony kidnapping, felony rape, felony aggravated assault, and by means of torture. After the trial court charged the jury and provided its instructions regarding the verdict slip, the court asked defense counsel if he had anything to add, and defense counsel did not raise an objection. *See* N.T. Trial, 11/15/18, at 1188.

As we have explained repeatedly, in order to preserve a claim for appellate review, an appellant must comply whenever the trial court orders him to file a Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925, and any issue not raised in a 1925(b) statement will be deemed waived. *Commonwealth v. Hill*, 16 A.3d 484, 494 (Pa. 2011). Further, Rule 647(C) of the Pennsylvania Rules of Criminal Procedure provides: "No portions of the charge nor omissions therefrom may be assigned as error,

unless specific objections are made thereto before the jury retires to deliberate."
Pa.R.Crim.P. 647(C). As Appellant did not challenge the trial court's jury instructions or the verdict slip before the jury retired to deliberate, he has waived his challenge for this reason as well. *See Commonwealth v. Montalvo*, 956 A.2d 926, 935 (Pa. 2008) (appellant's challenge to the submission of the (d)(6) aggravator to the jury was waived because he did not raise an objection thereto).

Appellant maintains that the "apparent error by the jury was not discovered by the defense until a review of the trial transcript [was] provided to the undersigned in preparation for this brief." Appellant's Brief at 21. However, Appellant and his trial counsel were present in court at the time the trial court instructed the jury, and when the jury verdict was returned. Thus, we reject Appellant's purported explanation as a basis to avoid a finding of waiver.

### D. Prohibition on Reading Expert Report During Closing Argument

Appellant next contends, in an argument comprising less than one-half page, that the trial court abused its discretion and committed an error of law when it refused to allow defense counsel, in his closing argument to the jury, to "read the opinions of Dr. Nezu from her expert report," which had been admitted into evidence, and instead limited counsel to "summarizing said opinions." Appellant's Brief at 22. Appellant asserts that there is "no rule of evidence or procedure that prohibits the reading of portions of an expert report . . . during closing arguments." *Id.* He further suggests that the jury's purported request during its deliberations to see Dr. Nezu's report demonstrates that the jury "obviously needed clarification as to her expert opinions on intellectual disability and adaptive functioning." *Id.*[8]

---

[8] In addressing this claim, the trial court noted that, while the jury, during its deliberations, asked, "Could the jury read from the testimony of Dr. Nezu?," the jury did not, contrary to Appellant's characterization of the request, ask "for the report, *per se,* but [rather] the testimony that was elicited during trial." Trial Court Opinion at 35.

A review of the trial transcript reveals the following exchange during the defendant's closing argument:

> **Defense counsel:** The Defendant also introduced the testimony of Christine Nezu. Unfortunately I have to read you some more of her testimony, but she is a professor. She's not a hired gun. . . . She's the pure expert in this case, a clinical psychologist. These are psychological issues.
>
> What did she tell you in regard to mitigators? I'm reading from page 28 of her report. Please bear with me with regard to the criteria.
>
> **Prosecutor:** Judge, I'm going to object to the report. He can summarize.
>
> **Court:** Slow down a little bit.
>
> **Defense counsel:** I knew that when I started. I'm just going to summarize her report.
>
> **Prosecutor:** Judge, I object to the report. He can summarize her testimony.
>
> **Court:** Okay.
>
> **Defense counsel:** Her testimony --
>
> **Court:** First of all, Mr. Dawson, the jury will not be getting the expert's report, but you may summarize her testimony rather than her report. The testimony came from her report.
>
> **Defense counsel:** Thank you, Your Honor.
>
> To summarize her testimony which came from the report, Dr. Nezu addressed the mitigators. She told you in her opinion that they were related to the mental deficits that are evident in Melvin Knight during February 2010. Dr. Bruce Wright would have you believe that these mental health issues just went away, were suspended, just weren't evident in February 2020. Use your common sense. That didn't happen. Melvin Knight has proven to you by his expert testimony, by a psychological clinician mitigators two, three, four and five.

N.T. Trial, 11/15/18, at 1142-44.

The trial court, in addressing Appellant's claim, observed that Appellant did not explain how the court's requirement that he summarize the expert's testimony instead of reading the report verbatim prejudiced him, nor did Appellant indicate what information he was unable to communicate to the jury. Trial Court Opinion at 34. The court further noted that Appellant "was not barred from describing Dr. Nezu's findings, or discussing the ways that Dr. Nezu testified that [Appellant's] mental deficiencies related to certain mitigating circumstances. Moreover, after the Commonwealth objected, defense counsel plainly stated that his intention was only to summarize the report." *Id.*

Upon review, we find that Appellant has waived this claim for two reasons. First, Appellant failed to lodge an objection with the trial court with respect to its ruling that he could summarize Dr. Nezu's testimony, but not read verbatim from her report, and, indeed, as noted by the court below, counsel specifically stated that he only intended to summarize Dr. Nezu's report. *See* Trial Court Opinion, 2/28/19, at 34; N.T. Trial, 11/15/18, at 1143 (Defense counsel: "I knew that when I started. I'm just going to summarize her report."). Issues not raised in the lower court are waived and cannot be raised for the first time on appeal. Pa.R.A.P. 302(a); *Commonwealth v. Smith*, 131 A.3d 467, 474 (Pa. 2015) (same).

Moreover, Appellant fails to explain what evidence he was prevented from conveying to the jury as a result of the trial court's limitation; thus, he has failed to properly develop his argument, and his claim is waived on this basis as well. *See Commonwealth v. Padilla*, 80 A.3d 1238, 1255 n.16 (2013) (undeveloped claim that is not explained factually nor supported by citations to law is unreviewable and waived); *Briggs*, 12 A.3d at 326 n.34 (undeveloped claim waived).

### E. *Allen* Instruction

Appellant's next claim, as set forth in his Statement of the Questions Involved, is that the trial court abused its discretion "in not providing an *Allen* instruction to the jury" when, after four hours of deliberation, which included approximately one hour during which Appellant's confession was replayed for the jury, it reported that it was deadlocked. Appellant's Brief at 3. An *Allen*[9] instruction, which has also been referred to as a "dynamite charge," is designed to "blast loose a deadlocked jury." *Commonwealth v. Greer*, 951 A.2d 346, 376 n.2 (Pa. 2008). In Pennsylvania, these types of instructions are referred to as *Spencer*[10] instructions, and we have described them as "instructions to a deadlocked jury to continue to deliberate, with an open mind to reconsideration of views, without giving up firmly held convictions." *Greer*, 951 A.2d at 376.

Preliminarily, it appears that Appellant misapprehends the nature of an *Allen* charge. Indeed, the trial court, upon receiving a note from the jury, instructed the jury as follows:

> **The Court:** [Y]ou're indicating to me that you're unable at this time to reach a unanimous verdict.
>
> Members of the jury, you went out at approximately 1:10 p.m., however you did come back in and listen to testimony, which lasted about an hour, so although you've been deliberating for about three hours I'm just wondering if perhaps a little more time would help you? You've had the case since 1:10. Obviously, you're having some difficulty resolving the issues raised in the case. On the one hand, that difficulty is an indication of the sincerity and objectivity with which you have approached your duties. On the other hand, it may be the result of confusion in your minds about the instruction I gave you on the law and about its application to the facts of this case.
>
> Mr. Wallace, does the jury require any additional or clarification instructions on the law as it applies to this case?

---

[9] *Allen v. United States*, 164 U.S. 492 (1896).
[10] *Commonwealth v. Spencer*, 275 A.2d 299 (Pa. 1971).

**Jury Foreperson:** Nobody has indicated that, Your Honor.

**The Court:** Okay. You realize, of course, that any verdict you return must be a unanimous verdict. That you have a duty to consult with one another and deliberate with a view to reaching an agreement, if it can be done without violence to your individual judgment. Each juror must decide the case for him or herself, but only after an impartial consideration of the evidence with his fellow jurors. A juror should not hesitate to reexamine his or her own views and to change his or her opinion if he or she thinks it erroneous. No juror should surrender an honest conviction to the weight or the effect of the evidence because of the opinion of fellow jurors or for the mere purpose of returning a verdict.

And again, ladies and gentlemen, I know that you have been working hard on this. I'm going to request that you try for at least little longer. It's important to the Defendant, to the county, to the attorneys, to everyone involved. And again, if it can be done without doing any harm to your honest convictions. Sometimes people can reexamine their views and see it from a different point.

Keeping these instructions in mind, I'm going to send you back to the deliberation room and I'm going to ask you to give some further consideration to the evidence and to the charge of the court to see if you can arrive at a verdict. If the court can be of any assistance to you in the effort, I would certainly be happy to oblige. I appreciate if you would put [in] some more effort.

N.T. Trial, 11/15/18, at 1196-97. Thus, it appears that Appellant's true complaint is not that the trial court failed to issue an *Allen* charge, but, rather, that it *erred in doing so*.

Regardless, we find Appellant's claim is waived for several reasons. First, although Appellant included this claim in his Statement of the Questions Involved, and makes a one-sentence reference thereto in his Summary of Argument, there is no separate section for this claim in the Argument portion of his brief. As the Commonwealth points out, the Rules of Appellate Procedure require an appellant to divide an argument

section of a brief into as many parts as there are to be argued, with each part including a discussion and citation of authorities for the issue raised. Pa.R.A.P. 2119(a). When an appellant fails to present an argument in support of an issue, the issue is waived. *Id.*

Nevertheless, we note that Appellant's Brief contains a two-paragraph discussion titled "Questions and Notes during deliberations" immediately following the conclusion of his argument regarding the reading of Dr. Nezu's expert report. Appellant's Brief at 22. In the middle of the first paragraph, Appellant asserts that, "[a]fter some four plus hours of deliberation (including the replaying of Defendant's confession) *Defendant requested and was denied that a question be posed to the foreperson whether they were hopelessly deadlocked.* This might have resulted in a deadlocked jury and a life sentence." *Id.* (citation omitted and emphasis added).

Although Appellant maintains, both in the excerpt of his brief quoted above and in his Summary of Argument, that defense counsel asked the trial court to inquire whether the jury was hopelessly deadlocked, and that the trial court denied his request, this Court has reviewed the transcript, and it reveals no such request by defense counsel. Thus, Appellant's claim is waived because he failed to raise it before the trial court. Pa.R.A.P. 302(a) (issues not raised in the lower court are waived and cannot be raised for the first time on appeal); *Smith*, 131 A.3d at 474 (same).

## F. Voir Dire

Appellant next argues that the trial court's denial of his pretrial motion seeking to employ the Colorado method of *voir dire* in capital cases constituted an abuse of discretion that warrants a new trial. According to Appellant,

> [t]he Colorado Method of capital voir dire is a structured
> approach to capital jury selection that is being widely used in

state and federal jurisdictions across the United States. Colorado Method capital voir dire follows several simple principles: (1) jurors are selected based on their life and death views only; (2) pro-life (jurors who will only vote for life) and pro-death jurors (jurors who will only vote for a death sentence) are removed utilizing cause challenges, and attempts are made by both parties to retain potential death-giving and life-giving jurors; (3) pro-death and pro-life jurors are questioned about their ability to respect the decisions of the other jurors; and (4) preemptory challenges are prioritized based on the prospective jurors' views on punishment. The Colorado Method of capital voir dire works to create a nonjudgmental respectful atmosphere during jury selection that facilitates juror candor and allows defense counsel to then learn the prospective jurors' views about punishment for a person guilty of capital murder and eligible for imposition of a death sentence.

Appellant's Brief at 24.

In a pre-trial motion, Appellant sought to pose to the jury 18 specific questions, which he asserted were consistent with the Colorado Method of *voir dire*, in order to "determine their ability to meaningfully consider and evaluate mitigating evidence." *Id.* Notably, Appellant does not set forth those questions in his brief to this Court, but simply claims that he "sought Court approval to ask questions of individual jurors" for this purpose, and "should have been able to cite the mitigators he sought in this remanded penalty trial and inquire whether any prospective juror would consider and give meaningful effect to them." *Id.* at 24-25. He argues that the trial court's denial of his request to utilize the Colorado Method of *voir dire* denied him a "life qualified"[11] jury and a fair penalty trial. *Id.* at 25.

In response, the Commonwealth first opines that it is unclear whether Appellant's pre-trial motion "was a request that the trial court replace entirely any existing *voir dire*

_____

[11] The term "life-qualify" refers to the process of identifying prospective jurors who have a fixed opinion that a sentence of death should always be imposed for a conviction of first-degree murder. *Commonwealth v. Smith*, 131 A.3d 467, 477 (Pa. 2015); *Commonwealth v. Le*, 208 A.3d 960, 973 n.15 (Pa. 2019).

system with the Colorado Method, or whether the motion was a request that the court's *voir dire* questions include some variation of each [of] the questions enumerated in the motion." Commonwealth's Brief at 22. In any event, the Commonwealth observes that "the trial court ruled on each of the Appellant's proposed questions individually rather than ruling on the entire motion to employ a particular *voir dire* method." *Id.*

In addressing Appellant's issue in its opinion denying Appellant's post-sentence motions, the trial court observed that Appellant "does not challenge the denial of any specific *voir dire* questions, so it cannot engage in a meaningful analysis of why any certain question was granted or denied." Trial Court Opinion, at 44. The court further noted that Pennsylvania law does not require that a defendant be permitted to utilize the Colorado Method of *voir dire*. *Id.*

It is beyond cavil that the Sixth and Fourteenth Amendments guarantee a defendant the right to, *inter alia*, an impartial jury, and this right extends to both the guilt and sentencing phases of trial. *Morgan v. Illinois*, 504 U.S. 719, 727-28 (1992). In a capital proceeding, "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 728 (citations omitted). The high Court explained:

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views.

*Id.* at 729.

In accordance with the above, this Court has expounded:

> To enable a capital defendant to enforce his [constitutional] right to an impartial jury, he must be afforded an adequate *voir dire* to identify unqualified jurors: "*Voir dire* plays a critical function in assuring the criminal defendant that his right to an impartial jury will be honored. Without an adequate *voir dire*, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." [*Morgan v. Illinois*, 504 U.S. at 729-30].
>
> While this Court has explained that the scope of *voir dire* is within the sound discretion of the trial court, *see Commonwealth v. Bridges*, [757 A.2d 859, 872 (Pa. 2000)], the United States Supreme Court has stated that the exercise of the trial court's discretion, and the restriction upon inquiries at the request of counsel, are "subject to the essential demands of fairness." *Morgan*, [504 U.S. at 730] (citation omitted). The high Court further held that, particularly in capital cases, "certain inquires must be made to effectuate constitutional protections," including questions regarding racial prejudice, and questions as to whether a juror's views on the death penalty would disqualify him from sitting, either because the juror's opposition to the death penalty is so strong that it would prevent the juror from ever imposing the same, or because the juror would always impose the death penalty following a conviction. *Id.* at 730-33.

*Commonwealth v. Le*, 208 A.3d 960, 972-73 (Pa. 2019) (footnote omitted).

In his brief, Appellant does not challenge the trial court's denial of any particular *voir dire* question, but, rather, asserts that he should have been able to cite the mitigators he intended to introduce at his sentencing trial and inquire whether the jurors would "consider and give meaningful effect to them." Appellant's Brief at 25.

We first note that, at the beginning of jury selection, the trial court went through the *voir dire* questionnaire with the prospective jurors, question by question. Question 30 provided:

> In the penalty trial, the decision of whether the Defendant must be sentenced to life or death depends on your weighing any aggravated circumstances proved by the Commonwealth against any mitigating circumstances proven by the defense. Are you confident that you will be able to participate with your fellow jurors in weighing these factors against each other?

N.T. Jury Selection, 10/29/18, at 19.

Furthermore, the record reveals that counsel was afforded and exercised the opportunity to question the prospective jurors regarding their ability to consider the evidence of both aggravating and mitigating circumstances, and weigh these factors fairly when determining whether to impose a sentence of life in prison without parole or death. *See e.g. id.* at 33-34 ("Do you think that you would be able to listen to all the evidence in this case, consider the aggravating circumstances, any mitigating circumstances, and based on that would you be able to render a fair verdict? . . . And would it be possible for you to render a verdict of a sentence of life imprisonment without the possibility of parole?"); *id.* at 41 ("During the course of this trial on behalf of Mr. Knight we will be presenting several mitigators that are listed by law. Are you willing to consider those mitigating factors and determine a verdict in his case?"); *id.* at 113 ("We will be presenting mitigating evidence, the Commonwealth presents aggravating, in favor of a life sentence. Would you be able to consider mitigating evidence fairly?"); *id.* at 254 ("And you were asked whether you can impose the death penalty. What I would like to ask you is, could you listen to all the evidence of both aggravating circumstances and mitigating circumstances, and if warranted, would it be possible for you to impose a sentence of life without the possibility of parole.").

To the extent Appellant argues that he should have been permitted to ask jurors whether they would give effect to the specific mitigating circumstances he intended to introduce, this Court previously has rejected this argument. In *Commonwealth v. Bomar*, 826 A.2d 831 (Pa. 2003), the appellant was sentenced to death following his conviction

of first-degree murder, rape, aggravated assault, kidnapping, and abuse of a corpse.  On appeal, the appellant claimed, *inter alia*, that the trial court denied him the opportunity to "life qualify" the jury during *voir dire* by restricting him from "questioning potential jurors about specific aggravating circumstances which might cause them to impose a death sentence and specific mitigating circumstances which might cause them to return a sentence of life imprisonment." *Id.* at 847.  Observing that the appellant failed to identify any instance in which he sought to question potential jurors regarding a specific *aggravating* circumstance, this Court addressed the three occasions on which the appellant claimed he was precluded from questioning potential jurors concerning specific potential *mitigating* circumstances, including the appellant's childhood, his character and record of "good deeds," and "circumstances about [the appellant]."  *Id.* at 847-48.  In holding that the trial court did not err in prohibiting the appellant from posing those questions to the potential jury, we explained:

> The purpose of *voir dire* is solely to ensure the empanelling of a competent, fair, impartial, and unprejudiced jury capable of following the instructions of the trial court. Neither counsel for the defendant nor the Commonwealth should be permitted to ask direct or hypothetical questions designed to disclose what a juror's present impression or opinion as to what his decision will likely be under certain facts which may be developed in the trial of a case. "*Voir dire* is not to be utilized as a tool for the attorneys to ascertain the effectiveness of potential trial strategies."

*Id.* at 849 (citations omitted).

We concluded in *Bomar* that the questions the appellant sought to ask prospective jurors:

> were intended to elicit what the jurors' reactions might be when and if appellant presented certain specific types of mitigating evidence. The questions were simply not relevant in seeking to determine whether the jurors would be competent, fair, impartial and unprejudiced. Rather, the queries at issue sought to gauge the efficacy of potential

mitigation strategies. Moreover, in the face of these inappropriate questions, the trial court asked appropriate general questions which revealed that the jurors in question would consider all the evidence, both aggravating and mitigating, and follow the court's instructions.

*Id.*

Thus, we reject Appellant's claim that the trial court abused its discretion in denying his request to utilize the Colorado Method of *voir dire* in this case.

## G. Photos

In his next issue, Appellant contends that the trial court abused its discretion in allowing the jury to view "several inflammatory graphic color photos of the victim's bloodied and battered body" during its deliberations. Appellant's Brief at 25. Appellant argues that the photographs were "irrelevant and unfairly prejudicial," in that he had "already pleaded guilty to stabbing the victim in the heart" and the photos' "evidentiary value did not outweigh the likelihood they would inflame the minds and passions of the jurors." *Id.* Appellant also alleges that, in denying his request that the photos shown at trial be in black and white instead of color, the trial court failed to comply with this Court's prior opinion, wherein we vacated his first sentence of death and remanded for a new penalty trial.[12] Appellant asserts that the trial court's admission of color photos at trial

---

[12] Specifically, Appellant points to the following language from the majority opinion in *Knight*, which was authored by Justice Dougherty and joined in full by Chief Justice Saylor and Justice Donohue:

On remand we suggest the parties and the court take stricter measures to mitigate the potential for a prejudicial effect upon the jury. The testimonial description of the acts committed by the conspirators, and the description of her injuries by Dr. Wecht and the detective vividly display the victim's suffering. As our cases recognize, this is not to say the trial has to be sanitized to the point where no photographs can or should be admitted. But, care can be taken not to allow the presentation to go to unnecessary extremes. This is not a case where the defendant seriously contested the existence of the torture aggravator; indeed, appellant's counsel never argued against

also is inconsistent with this Court's holding in *Commonwealth v. Ballard*, 80 A.3d 380 (Pa. 2013).

In the instant case, we note that the Commonwealth suggests in its brief that it is "unclear from the Appellant's brief whether he is challenging the court's pre-trial decision to admit autopsy photos under limited circumstances or the court's pre-jury deliberation decision to send certain photos out with the jury." Commonwealth's Brief at 28. Thus, it indicates that it will address both. However, we construe Appellant's challenge as pertaining to only those photographs that were provided to the jury during its deliberations. *See* Appellant's Brief at 25 ("Inflammatory autopsy photos should not have been admitted and provided to the jury during deliberations"); *id.* at 25 ("several inflammatory graphic color photos of the victims' bloodied and battered body were provided to the jury to review during its deliberations"); *id.* at 26 ("The decision of the trial court to admit these photos at trial and to allow the jury to view these photographs during jury deliberations amounts to an abuse of judicial discretion."). Thus, we limit our review to those photographs which were provided to the jury during their deliberations.

Notably, and consistent with the repeated deficiencies in his brief, Appellant does not identify the specific photographs he claims should not have been provided to the jury.

---

torture in his closing. In addition, the trial court recognized certain measures should be taken to limit the jury's exposure to the photographs but, for some reason, they were not followed, as the jury saw the photographs twice during the trial, and also had them in deliberations.

156 A.3d at 254-55.

Justice Baer authored a concurring opinion, distancing himself, *inter alia*, from the above-quoted portion of the opinion on the basis that, because the issue regarding the autopsy photos was moot, an opinion on the matter was "inappropriate." *Id.* at 256 (Baer, J., concurring). I also distanced myself from the above-quoted language for the reasons articulated by Justice Baer. *Id.* at 257 (Todd, J., concurring). Furthermore, Justice Mundy filed a dissenting opinion, and Justice Wecht did not participate in the decision. As a result, the above-quoted language was endorsed by only a plurality of the participating Justices.

A review of the transcript, however, reveals that Appellant's counsel objected to four photographs being sent into the jury deliberation room:

> Your Honor, for the record, we're objecting to photos marked . . . Commonwealth's Exhibit 10A, which is a picture of a trash can that shows the body and the blood and jeans and part of I believe the lower extremity.
>
> Commonwealth Exhibit 13, which I honestly don't know what it is, but it is a just described as a pink bag covering the body with part of the body protruding. That's 13.
>
> Commonwealth 14 is a rather graphic picture of Jennifer tied-up and bloody, showing her head and hands. It's rather gruesome.
>
> And Exhibit 15 is a photo of Jennifer on the autopsy cart it looks like with jeans and part of her bloody torso exposed.
>
> We're objecting to those going out to the jury.

N.T. Trial, 11/15/18, at 1190.

It is well settled that the admissibility of evidence is a matter within the discretion of the trial court, and will be reversed only upon an abuse of that discretion. *Le*, 208 A.3d at 970. This Court has repeatedly explained that

> photographic evidence of a murder victim is not *per se* inadmissible; instead, the admissibility of photographic evidence depicting a murder victim involves a two-part analysis. "The court must first determine if the photograph is inflammatory and then, if it is, the court must apply a balancing test to determine whether the photograph is of such essential evidentiary value that its need clearly outweighs the likelihood of inflaming the minds and passions of the jury."

*Ballard*, 80 A.3d at 392-93 (citations omitted).

Moreover, "[i]n capital cases where a jury is empanelled only for the penalty phase of trial, photographs have essential evidentiary value if they help inform the jury about the history and natural development of the facts of the case, or if they potentially rebut

mitigation evidence." *Id.* at 393; *see also Commonwealth* v. *Marshall,* 643 A.2d 1070, 1075 (Pa. 1994) (photographs depicting victims in condition they were found as result of crimes were admissible because they assisted jury in understanding facts surrounding victim's death and provided "insight into the nature of the offenses"). Further, "[t]he availability of alternate testimonial evidence does not preclude the admission of allegedly inflammatory evidence." *Ballard*, 80 A.3d at 393 (citations omitted). Nevertheless, this Court has found that a trial court abused its discretion in admitting such photographs "when the situation generally entails indifference from the trial court or the Commonwealth to the photographs' prejudicial effect, or where the precautions taken were not commensurate with the nature of the scene depicted." *Id.; see also Commonwealth v. Chacko,* 391 A.2d 999, 1000–01 (Pa. 1978) (measures not enough to cure prejudice where photographs were close-ups of victim's body at crime scene and depicted large gaping wounds and bloodied clothing).

Additionally, Rule 646 of the Pennsylvania Rules of Criminal Procedure provides that, "[u]pon retiring, the jury may take with it such exhibits as the trial judge deems proper." Pa.R.Crim.P. 646. As with the admission of evidence, the determination of which items may be viewed by the jury is within the discretion of the trial court.

In rejecting Appellant's objection to allowing the jury to view the photos during its deliberations, the trial court stated:

> In the previous three trials [of Appellant's co-defendants] all the autopsy photos went out and I was not reversed on that, but out of an abundance of caution I did not allow the autopsy photos to go out with the jury in this case, nor did I allow them to be shown more than one time and so the autopsy photos were only shown to Dr. Wecht, however these photos I think there's no problem with them going out. I mean, the fact they're prejudicial. This was an allegation of a torture murder of a person. The Defendant pled guilty to First Degree Murder and I think that these are relevant to show, as the

Commonwealth argued, the extent that the Defendant and his Co-Defendants went to hide the crime.

N.T. Trial, 11/15/18, at 1192-93.

Appellant's argument to this Court with regard to the trial court's admission of photos of the Victim is comprised of a mere three paragraphs, and includes the following bald assertion:

> In a case such as this, where a young mentally challenged girl was tortured and murdered, these bloody, graphic photos of the victim's dead body jammed into a trash can were inflammatory and highly prejudicial. Their relevance to torture and the principle that murder cases need not be sanitized was significantly outweighed by their prejudicial impact upon this capital jury, resulting in verdict based on passion and prejudice.

Appellant's Brief at 26.

The Commonwealth points out that the challenged photos were taken prior to the victim's autopsy, and did not show visible wounds or a substantial amount of blood. The Commonwealth further responds that

> [t]he photos showed the state in which the victim was found: bound by Christmas decorations and stuffed into a garbage can, facts that were crucial to the narrative of the case. The court determined that although the photos were prejudicial, they were relevant to show the extent that the Appellant [and] his co-defendants went to hide the crime.

Commonwealth's Brief at 34.

We have reviewed each of the four photographs that were provided to the jury during its deliberations. Exhibit 10A is a photo of the inside of the trash can as it appeared when the Victim's body was found therein. It shows a black trash bag covering the legs of the Victim, who had been placed upside-down inside the trash can, with the top portion of her jeans and a slight portion of her lower back visible. The photograph does not show the Victim's face, nor any blood or open wounds.

Exhibit 13 is photograph of the Victim once she was removed from the trash can, lying on a sheet on an autopsy table. The Victim is lying in a fetal position on her side, and there is a clear plastic bag on the upper portion of her body; her face and head are not visible. A portion of the Victim's lower back and upper buttocks is visible, and there appear to be bruises and/or blood on that portion of her body, but no wounds. Her legs are covered by a black trash bag. There appears to be smeared blood inside the clear plastic bag, which makes the bag appear pink in color, as suggested by defense counsel's description of the photo.

Exhibit 14 consists of a photograph of the Victim on her side, in a fetal position, facing forward, on an autopsy table. The photo shows the Victim's shorn head, but her bound hands are in front of her face and, thus, her face is not visible, although her right ear can be seen. The Victim is wearing a shirt and jeans, and a portion of her right lower abdominal area and hips can be seen. While the Victim's body appears bloody and the shirt appears blood-soaked, there are no visible wounds. The photograph shows the Christmas lights that were tied around the Victim's hands, and dangled across her body.

Finally, Exhibit 15 is a photo of the lower half of the Victim's body, clothed in jeans, with her sock-covered feet in a trash bag, on an autopsy table. A small area of her waist just above her jeans is visible, but there are no open wounds. The photo shows the Christmas garland that was wrapped around the Victim's ankles.

Our review of the above photos leads us to the conclusion that the photos had essential evidentiary value which was not outweighed by their inflammatory nature. As the trial court observed, the Victim was subjected to a lengthy period of torture before she was killed, and the photos demonstrate the restraint and humiliation that was inflicted upon her in this regard. Additionally, the photos illustrate the steps that Appellant and his co-defendants took to hide the Victim's body. Thus, we find that the photographs assisted

the jury in understanding the facts of the Victim's death and the nature of the offenses. *See Marshall,* 643 A.2d at 1075. Further, while clearly disturbing, we would not characterize the photos as "gruesome," as they were not close-ups of the Victim's wounds or injuries. *Cf. Chacko,* 391 A.2d at 1000–01.

Moreover, a review of the trial transcript and the trial court's opinion demonstrates that the trial court carefully exercised its discretion both in determining which photos to admit at trial and which to send out with the jury during its deliberations. In fact, the trial court instructed the jury, prior to its deliberations, that the more graphic and grisly photographs that were admitted during the trial, but which were not sent out with the jury,

> were admitted into evidence for the purpose of showing the nature and extent of the wounds received by Jennifer Daugherty, and to help you understand the testimony of the witness who referred to these injuries and wounds.
>
> They are not pleasant photographs to look at. You should not let them stir up your emotions to the prejudice of the Defendant. Your verdict must be based on an impartial and fair consideration of all the evidence and not on passion or prejudice against the Defendant.

N.T. Trial, 11/15/18, at 1159-60.[13]

Accordingly, for the reasons set forth above, we hold that the trial court did not abuse its discretion in permitting the jury to have the four challenged photos during its deliberations.

## H. Jury Instruction on Victim Impact Evidence

---

[13] Hence, we reject Appellant's claim that the trial court failed to comply with this Court's decision in *Knight.* First, the language relied on by Appellant was agreed to by a plurality of the Court, and, thus, was nonbinding. *See Commonwealth v. Bomar*, 826 A.2d 831, 843 n.13 (Pa. 2003) ("While the ultimate order of a plurality opinion, *i.e.* an affirmance or reversal, is binding on the parties in that particular case, legal conclusions and/or reasoning employed by a plurality certainly do not constitute binding authority."). At any rate, it is evident that the trial court took pains to limit the jury's exposure to the most disturbing photographs in order to limit the potential for prejudice.

Appellant next claims that Pennsylvania Suggested Standard Criminal Jury Instruction 15.2502F.7,[14] which pertains to the jury's consideration of victim impact evidence when weighing aggravating and mitigating circumstances and which the trial court provided to the jury, violates "the Pennsylvania Judiciary Code and Pa Supreme Court rulings interpreting that Code that a verdict of death cannot be based on passion, prejudice or any arbitrary factor, 42 Pa.C.S.A. 9711." Appellant's Brief at 26-27. Although Appellant fails to identify where in the record the challenged instruction may be found, as he is required to do under Pa.R.A.P. 2019(c), he appears to refer to the following instruction by trial court:

> You have heard evidence about the victim and about the impact of the victim's murder upon her family. This evidence is subject to two special rules. First, you cannot regard it as an aggravating circumstance. Second, if you find at least one aggravating circumstance and at least one mitigating circumstance, you may then consider the victim and the family impact evidence when deciding whether aggravating circumstances outweigh the mitigating circumstances.

N.T. Trial, 11/15/18, at 1177.

---

[14] The instruction provides:
> You have heard evidence about the victim and about the impact of the victim's murder upon [his] [her] family. I'm talking about the statements made by [*name of family member*]. This evidence is subject to two special rules. First, you cannot regard it as an aggravating circumstance. Second, if you find at least one aggravating circumstance and at least one mitigating circumstance, you may then consider the victim and family impact evidence when deciding whether aggravating outweigh mitigating circumstances. Each of you may give the victim and family impact evidence whatever weight [, favorable or unfavorable to the defendant,] that you think it deserves. Your consideration of this evidence, however, must be limited to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence presented.

Pa. SSJI (Crim), § 15.2502F.7 (square bracketing original).

Observing that Appellant did not object to the jury instruction at the time of trial, or raise it in his post-sentence motion, the Commonwealth contends that the issue is waived. We agree. As noted above, no portion of a jury charge or omissions therefrom may be assigned as error, unless specific objections are made before the jury retires to deliberation. Pa.R.Crim.P. 647(c); *Montalvo*, 956 A.2d at 935. Moreover, issues not raised in the lower court are waived and cannot be raised for the first time on appeal. Pa.R.A.P. 302(a). Appellant failed to object to the trial court's charge when it was given; failed to raise his claim in a post-sentence motion; and raises it for the first time on appeal. Accordingly, his claim is waived.

## I. Statutory Review of Death Sentence

In his final issue, Appellant, in a one-paragraph argument, contends that the jury's verdict was the result of passion, prejudice and arbitrary factors, and was "against the great weight of evidence presented." Appellant's Brief at 27. Specifically, Appellant asserts that the evidence of his intellectual disability, and the jury's finding of three different mitigating factors, suggest that the verdict of death was against the weight of the evidence. Appellant further posits that the admission of graphic photos of the victim, combined with the family's victim impact statements, resulted in a verdict "based on passion and sympathy for the victim and her family." *Id.*

Even if Appellant had not raised this issue in his brief, this Court is required to conduct an independent review to determine (1) whether the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or (2) if the evidence fails to support the finding of at least one aggravating circumstance listed in 42 Pa.C.S.A. § 9711(d). *See* 42 Pa.C.S.A. § 9711(h)(3) (requiring affirmance of the sentence of death unless this Court concludes either of these two factors are present); *Ballard*, 80 A.3d at 409-10 (same).

The Commonwealth first responds that an appellant may not use a weight of the evidence claim to challenge a death sentence. Commonwealth's Brief at 39. The Commonwealth is correct in this regard. In *Commonwealth v. Reyes*, we explained that the power to vacate a death sentence is circumscribed by Section 9711(h)(3) of the Sentencing Code, and "[t]his restriction on our authority has caused this Court to reiterate many times that it is exclusively the function of the jury in the first instance to decide whether aggravating and mitigating circumstances exist and then whether the aggravating circumstances outweigh any mitigating circumstances." 963 A.2d 436, 441 (Pa. 2009). As such, this Court "may not reverse a death penalty on weight of the evidence grounds." *Id.* at 442.

With respect to Appellant's claim that the jury's verdict was the result of passion, prejudice, or other arbitrary factors, we likewise reject this argument. Following our thorough review of the record in this case, we conclude that Appellant's sentence of death was not the product of passion, prejudice, or any other arbitrary factor, but, rather, was fully supported by the evidence that Appellant and his co-defendants held the intellectually-disabled victim against her will for several days, during which time they continuously subjected her to myriad forms of physical and emotional torture, eventually stabbing her in the chest, slicing her throat, strangling her, and stuffing her body into a trash can which they left outside under a truck.

Additionally, the Commonwealth proved at least two separate statutory aggravators beyond a reasonable doubt: (1) the offense was committed during the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), including kidnapping and aggravated assault; and (2) the killing was committed by means of torture, *id.* § 9711(d)(8). Although the jury found three mitigating circumstances − Appellant's lack of a significant history of prior criminal convictions, § 9711(e)(1); the fact that Appellant was under the influence of

extreme mental or emotional disturbance, § 9711(e)(2); and that Appellant acted under extreme duress or under the substantial dominion of another person, § 9711(e)(5) − the jury determined that the aggravating circumstances outweighed the mitigating circumstances.

As the jury found that the aggravating circumstances outweighed the mitigating circumstances, Appellant's sentence complies with the statutory mandate for the imposition of a sentence of death. *See id.* § 9711(c)(1)(iv). Accordingly, there are no grounds upon which to vacate Appellant's death sentence pursuant to Section 9711(h)(3).

For all of the above reasons, we affirm Appellant's sentence of death.

Chief Justice Saylor and Justices Baer, Donohue, Dougherty and Mundy join the opinion.

Justice Wecht did not participate in the consideration or decision of this case.